## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ISAAC W. SANDERS,** | **CIVIL COMPLAINT** |
| **Plaintiff,** | **NO. 3:18-CV-1423** |
| **v.** | **JURY TRIAL DEMANDED** |
| **PENNSYLVANIA'S STATE SYSTEM OF HIGHER EDUCATION and EAST STROUDSBURG UNIVERSITY;** | **THE HONORABLE A. RICHARD CAPUTO** |
| **Defendants.** | |

## SECOND AMENDED COMPLAINT

**NOW COMES,** the Plaintiff, Isaac W. Sanders, by and through counsel, Harry T. Coleman, Esquire and hereby complains of the above-referenced Defendants and submits the following:

## INTRODUCTION

This is a civil action for damages under 42 U.C. § 1983 and 42 U.C. § 1988 from a travesty of administrative and public lynching of the Plaintiff in his capacity as the Development Director of East Stroudsburg University ("ESU" or "University") and thereafter.   Dr. Isaac W. Sanders was victimized, and has continually been victimized, by unfounded allegations of sexual harassment and theft spawned from several anonymous letters sent

to University officials and published in a newspaper of general circulation in and around East Stroudsburg, Pennsylvania.    The conduct of the Defendants has been continuous, through separate and discrete incidents, leading up to the recent pronouncement by the Pennsylvania Attorney General that he would not pursue a bill of costs against the unsuccessful student plaintiffs ("victims") thereby conveying, once again, the guilt and supposed liability of Isaac Sanders in regard to the allegations of student sexual assault and theft.   The rumors and innuendo, unfounded as they have been proven to be, resulted in Dr. Sanders being put on a leave of absence and termination from the University and continued stigmatization by repeated and separate events.   Dr. Sanders has been tried and convicted in the court of public opinion by the conduct of the Defendants yet vindicated in this Court. Plaintiff was castigated publicly and in the press by former Pennsylvania Governor Edward Rendell who served as a member of the Board of Governors of the Pennsylvania State System of Higher Education ("PASSHE").   Dr. Sanders vigorously defended and prevailed in a civil rights suit filed in the United States District Court for the Middle District of Pennsylvania by six (6) former male students who were caught up in the frenzy of the rumor and innuendo that permeated the East Stroudsburg University community.   The United States Court of Appeals and the United

States Supreme Court upheld the jury's verdict.

Isaac Sanders good name, reputation, honor and integrity has been destroyed by the stigmatizing conduct the government defendants have done to him from his termination at East Stroudsburg University under a cloud of criminal suspicion and with each subsequent violation by failing, to date, to provide him a name-clearing hearing, forcing him to expend his own personal funds for a defense, failing to provide him a defense in the United States District Court for the Middle District of Pennsylvania litigation, a defense in the Appeal to the United States Court of Appeals, and to the United States Supreme Court; potentially exposing him to an adverse financial judgment in the civil litigation and by continuing to defame and impugn his reputation after he had been cleared of any improper conduct by the one student who came forward and did not hide behind anonymity and the favorable verdict he received from a jury of his peers who found the allegations of the student complainants in a federal courtroom to be unfounded.

As a result of the Defendants' actions, Plaintiff has suffered deprivation of rights guaranteed to him under the Constitution of the United States.   Dr. Sanders has suffered economic and emotional harm; he has suffered irreparable harm to his professional reputation and he has incurred

significant legal fees in defending himself against claims that the Defendants knew were baseless.

## PARTIES

1.      Plaintiff Isaac W. Sanders is a citizen and resident of Texas.

2.      Defendant, East Stroudsburg University is an institute of higher education under the control and operation of the Commonwealth of Pennsylvania by virtue of ESU's membership in PASSHE.   East Stroudsburg University has a principle address of 200 Prospect Street, East Stroudsburg, Monroe County, Pennsylvania 18301.

3.      On information and belief, ESU and PASSHE are recipients of funds from the United States government.

4.      The Defendant Pennsylvania's State System of Higher Education has a principal address of 2986 N. 2nd Street, Harrisburg, Pennsylvania 17110.

5.      PASSHE was established by the legislature of the Commonwealth of Pennsylvania on July 1, 1983 and operates fourteen state universities located within the Commonwealth, including East Stroudsburg University.

6.      PASSHE serves over one hundred thousand students and employees more than twelve thousand faculty and staff.

4

7.     PASSHE is provided oversight by a 20-member Board of Governors that is responsible for oversight of the State System.   The Board establishes broad educational, fiscal, and personnel policies.   The Board, among other tasks, appoints the chancellor and each university president, approves new academic programs, sets tuition, and coordinates and approves the annual State System operating budget.

8.     The Governor of Pennsylvania is a member of the PASSHE Board of Governors.

## JURISDICTION AND VENUE

9.     This action arises under the Fourth and Fourteenth Amendments to the Constitution of the United States; 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

10.     The Court has jurisdiction over Plaintiff's constitutional and federal law claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

11.     Venue is proper in the United States District Court for the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391 due to a substantial part of the events giving rise to these claims occurred in the Middle District of Pennsylvania.

## FACTUAL ALLEGATIONS

### A.   Isaac W. Sanders Tenure at East Stroudsburg University

#### 1.   Hiring of Isaac W. Sanders

21.   East Stroudsburg University is a public university of higher education and is a member of PASSHE with an address located at 200 Prospect Street, East Stroudsburg, Pennsylvania.

22.   East Stroudsburg University and PASSHE, on information and belief, are recipients of funds from the federal government.

23.   At all relevant times herein, Robert J. Dillman was President of East Stroudsburg University duly appointed by PASSHE.

24.   At all relevant times hereto, Kenneth Borland was the Provost at East Stroudsburg University and also served as Interim President during 2008.

25.   At all relevant times, Victoria L. Sanders, no relation to the Plaintiff, was the Associate Vice President for Special Projects, Diversity, and Equity at East Stroudsburg University and Dr. Victoria L. Sanders reported directly to the University President.

26.   Isaac Sanders received a B.S. degree from Tuskegee Institute in 1971 and subsequently received a Master's Degree from Cornell University and his Doctorate degree from Kansas State University.

27.   With regard to East Stroudsburg University, Dr. Isaac Sanders

6

was hired in 2000 and employed as a Vice President for Institutional Advancement and also served as Executive Director for East Stroudsburg University Foundation ("Foundation").

28.    In 2007, Plaintiff Isaac Sanders ("Isaac Sanders") was the Vice President for Advancement at ESU.    He was the head of the Advancement Office and also the Chief Executive Officer of the East Stroudsburg University Foundation.

29.    Isaac Sanders reported to two people: the Chair of the University Foundation Executive Committee and President Dillman.

30.    The relationship between the University and the Foundation is defined in a Memorandum of Understanding.

31.    The Foundation was put in place to hold funds for East Stroudsburg University.

32.    Dr. Sanders was lauded in 2006 in the *Chronicle of Higher Education* where he was interviewed for an article that praised the fundraising efforts of the University.

33.    In September 2007, Dr. Isaac Sanders was lauded by President Dillman for his fundraising efforts in regard to the East Stroudsburg University Science and Technology Building.

34.    On information and belief, certain individuals were covetous of

7

the position held by Isaac Sanders and upset with the recognition he was receiving.

35.    As discussed below, also in September 2007, the first anonymous letter is forwarded to various officials at East Stroudsburg University concerning a fundraiser and contemporary of Isaac Sanders. This letter coincidentally followed the praise directed at Isaac Sanders by Dr. Dillman on the Science and Technology Building fundraising.

36.    On information and belief, it is asserted that under the leadership of Dr. Isaac Sanders, East Stroudsburg University raised in excess of Fifteen Million Dollars.

37.    Isaac Sanders established himself as an accomplished fundraiser which elevated the stature of ESU prior to his termination.

38.    On information and the belief of Plaintiff Dr. Isaac Sanders, individuals within the University community at East Stroudsburg, were unsettled by the fact that the highly successful University fundraising at East Stroudsburg was headed by a person of color.

39.    For the employment period of July 1, 2007 to June 30, 2008, the management performance appraisal of Isaac W. Sanders by his supervisor, University President Robert J. Dillman was rated at or above expectations.

40.    University President Dillman found as of July 8, 2008, focusing on the period of July 1, 2007 through June 30, 2008, the following as it concerns the employment of Dr. Isaac W. Sanders:

> The success of the advancement office in achieving and exceeding its financial goals has been due to the leadership of Isaac Sanders.   The work of the alumni association continues to grow but needs greater expansion and involvement of alumni throughout the region and nation.   Isaac has worked to improve diversity in his office and around the campus.   He has been a very important team player in the senior staff and has continued to be active in advancement national organizations.   One caveat is the need for stable staffing and new hires that bring expertise to the organization.

## 2.    Student Complaint Against Dr. Sanders

41.    In March 1998, a Notice of Non-Discrimination Policy issued from the Office of the President at East Stroudsburg University.

42.    On August 24, 2007, Victoria Sanders and others met with the student complainant and his attorney at a private home where Dr. Victoria Sanders first learned of the student allegations against Isaac Sanders. Coincidentally, the attorney would later represent all Plaintiffs in the civil rights claim in this court and a self-appointed vocal critic of Plaintiff Sanders.

43.    Dr. Victoria Sanders correctly referred the student to the University's Office of Diversity to file a complaint.

44.    Immediately after the meeting, Dr. Victoria Sanders called

PASSHE counsel, Andrew C. Lehman, Esquire and told him about student's allegations against Isaac Sanders.

45.   On Monday, August 27, 2007, the student filed a complaint about Isaac Sanders with the Office of Diversity and Equal Opportunity.

46.   The formal complaint against Dr. Sanders alleged sexual harassment.

### 3.   Between October 1 and November 20, 2007 Anonymous Letters Regarding Isaac Sanders Sent to University

47.   Prior to the student's complaint to East Stroudsburg University on August 24, 2007 regarding Isaac Sanders, discussed above, it was the University's practice not to accept anonymous letters as a basis for an investigation into discrimination or harassment.   If the complainant did not come forward, the Diversity Director did not include any anonymous letters in the internal investigation reports.

48.   On October 1, 2007, October 10, 2007, and November 6, 2007, East Stroudsburg University received three anonymous letters addressed to President Dillman and others.   On November 15, 2007 and November 20, 2007 the University received copies of two more anonymous letters, both dated November 1, 2007.

49.   One of the anonymous letters had been addressed to ESU's

Council of Trustees and the other had been addressed to a former University Foundation Board member.   All the anonymous letters were received after the lone student made his initial allegations to the Diversity Director in August of 2007.

50.    The first anonymous letter dated September 28, 2007 makes no reference to any alleged sexual improprieties involving Isaac Sanders. However, Dr. Sanders' oversight of the University Foundation and Advancement Office is impugned.

51.    The remaining anonymous letters that refer to Isaac Sanders make various accusations but they lack details of Isaac Sanders' alleged misconduct, including dates, times, names of witnesses or any victims (except that the complaining student is mentioned once by his first name).

52.    These letters do not state the source of the writer's information or whether that source was reliable, or otherwise indicate how the writer became aware of the information provided.

53.    The anonymous letters and all allegations against Dr. Isaac Sanders were widely published in a newspaper of general circulation in both the University Community and the geographic region of the East Stroudsburg area.

54.    The letters demanded the termination of Isaac Sanders.

55.    The letters threatened University President Dillman if he did not take the termination action demanded in the letters.

56.    Although one of the letters mentions the complaining student by name, none of the anonymous letters received by the University provided any specific details or information about allegations of the complaining student that he was sexually harassed by Isaac Sanders.

57.    The letters provided no information which could either confirm or refute the student's allegations.   It is objectively obvious that the author of the anonymous letters was aware of the investigation into the student's complaint against Dr. Isaac Sanders and that these letters were merely sent to supplement the erroneous charges leveled against Dr. Sanders and force his ouster from the University.

### 4.    University Policy Prohibiting Discrimination and Harassment

58.    The University maintained a policy enacted on November 3, 1997 which prohibited discrimination and harassment.

59.    The policy provided that:

> No student or employee of the University, or contractor/vendor conducting business with the University, may engage in illegally harassing conduct which creates a hostile learning or work environment for other students or employees of the University.

60.    The policy defines harassment as including unwelcome conduct based on gender; clearly offensive conduct; verbal, visual, or physical behavior that is targeted at an individual adversely affecting the learning environment; and criminal harassment.

61.    The policy provided that, along with wide distribution of notice of the policy, workshops would be periodically conducted for employees of the University regarding discrimination, harassment, including sexual harassment, diversity, and consensual relationships.

62.    In the fall of 2007, all University employees were required to take a course in sexual harassment.

63.    The policy also provided a procedure for the submitting and investigating of discrimination and harassment.

64.    The Officer of Diversity and Equal Opportunity was tasked with either assisting in an amicable resolution of the claim by mutual agreement or commencing an investigation.   The Director would act as a neutral investigator and not as an advocate for any of the parties.

65.    According to the Non-Discrimination Policy, within ten (10) working days of the conclusion of the investigation, the Director shall make available to the parties a written report.   The findings of the investigator must indicate whether it was more likely than not a violation of the Policy

occurred.

66.    The parties to a dispute are afforded ten (10) working days to provide to the Director their written responses to the investigation report.

67.    At the end of the ten (10) day period, the Director shall file the report and any written responses received from the parties with the appropriate vice president.

68.    According to the Policy at East Stroudsburg University, once the appropriate Vice President or the President has reviewed the report of the Director along with any response thereto filed by any of the parties, a determination shall be made whether to close the complaint, attempt informal conciliation or initiate disciplinary proceedings.

69.    Dr. Sanders responded to the sole student complaint and specifically denied the allegations of the student.

70.    The Director of Diversity shared his written report with the student and Dr. Sanders.

71.    The student and Dr. Sanders, consistent with University procedures, were each given the opportunity to provide a response to the Internal Investigation Report of the Director.

72.    The Director of Diversity for East Stroudsburg University submitted his final report to President Dillman on December 10, 2007.

73.   **On January 7, 2008, the sole complaining student was advised through correspondence from President Robert J. Dillman of East Stroudsburg University that the investigation conducted by the Director of Diversity and Campus Mediation had been completed.**

74.   **The University President concluded, based upon the thorough investigation conducted, that there is insufficient evidence to support the allegation and the University considered the matter closed.**

75.   No student, present or former, other than the student who filed a complaint in August 2007, ever filed a complaint against Dr. Sanders with the University's Office of Diversity, the Pennsylvania Human Relations Commission, the Equal Opportunity Employment Commission or with any state or federal law enforcement agency.

76.   Dr. Isaac Sanders had no way to defend against hateful gossip, innuendo and rumor accusing him of student sexual assault and theft given the imprimatur by the Defendants.

77.   At no time did any Defendant publically defend Dr. Sanders against the hateful gossip, innuendo and rumor accusing him of student sexual assault and theft.

78.   To the contrary, the actions of the Defendants has consistently

and continually conveyed that Dr. Sanders was responsible for the student sexual assaults all while depriving him of his constitutionally protected rights.

### 5.   Internal Employee Complaint of Financial Mismanagement of Development Office

79.   The Advancement Office raised funds for ESU.   The office also worked with university alumni to cultivate their relationship with ESU.

80.   The East Stroudsburg University Foundation ("ESU Foundation") is a private non-profit organization whose purpose is securing private gifts and grants to benefit ESU.

81.   On January 14, 2008, **one week following the close of the investigation spawned by the sole student complaint** against Dr. Sanders, a meeting was conducted between Provost Kenneth Borland and Carolyn Bolt, a University employee within the Development Office headed by Dr. Isaac Sanders.

82.   The meeting on January 14, 2008 centered solely upon Mrs. Bolt's allegations against Dr. Sanders and her perception of his mismanagement of the Development Office.

83.   In light of the fact that one of the anonymous letters made allegations regarding a purported arrest of Isaac Sanders, President Dillman asked the University's Chief of Police, Robin Olson, to review campus police records and also to check with local law enforcement, to verify the

allegations as to Isaac Sanders' alleged arrest.

84.    **Chief Olson investigated this issue and determined the allegation of Isaac Sanders' arrest to be unfounded**.

85.    After the University received these anonymous letters, the letters were turned over to the PASSHE's counsel who provided them to the Federal Bureau of Investigation ("FBI") on December 5, 2007 and gave the FBI permission to contact President Dillman and Dr. Victoria Sanders directly.

86.    **The actions of the Defendants here sent a loud message that those in the University community, including the Defendants, not only felt Dr. Sanders was responsible for the anonymous allegations but felt his alleged conduct constituted criminal conduct.**

### 6.    <u>The Second Investigation of Dr. Isaac Sanders with No Complainant</u>

87.    Although the University had a stated policy that it would not consider anonymous letters and that Dr. Dillman had disproven the allegation concerning an alleged arrest of Isaac Sanders, PASSHE's counsel elevated these anonymous documents by forwarding these worthless anonymous letters to the FBI, the chief federal law enforcement agency in the United States.

88.    The anonymous letters above were forwarded in the fall of 2007

17

during the first internal investigation conducted by the University. These letters were provided to President Dillman, Trustees of East Stroudsburg University, the PASSHE Chancellor, and news media in the East Stroudsburg area. The letters alleged sexual predatory behavior by Isaac Sanders and financial misdeeds.

89.    **A Forensic Audit was subsequently conducted by the East Stroudsburg University Foundation which reported no financial mismanagement or theft**

90.    The audit of the ESU Foundation for 2007-2008 was performed by the Allentown, Pennsylvania based accounting firm of Concannon, Miller & Co. P.C.

91.    **The audit reports of the ESU Foundation were found to be all clear and the allegations against Dr. Sanders of financial misdealing were proved wrong.** The scope of the audit was more than normal based upon the anonymous allegation circulating as to Dr. Isaac Sanders.

92.    On information and belief, the results of the forensic audit were never published by the Defendants within the university community or in the geographical community surrounding ESU thus allowing the allegations of theft and mismanagement to permeate as to Plaintiff Sanders.

       7.    <u>**In Late November, 2007, Isaac Sanders Brings Unrelated Advancement Office Personnel**</u>

## Problems to Dillman's Attention

93.   On the Sunday after Thanksgiving, 2007, within weeks of having received the anonymous letters, President Dillman received a telephone call from Isaac Sanders at home.

94.   Isaac Sanders informed Dillman that he had a conversation with an ESU employee and that she had reported to him that employees within the Development Office, Carolyn Bolt ("Bolt") and Robert Kelley ("Kelley"), were undercutting him in the running of the Advancement Office and seeking his ouster.

95.   The employee said that Bolt and Kelley were doing things behind Isaac Sanders' back.

96.   Importantly, Bolt and Kelley worked in the Advancement Office under Isaac Sanders.

97.   On December 6, 2007, Victoria Sanders traveled to New Jersey with Isaac Sanders at his request to attend a lunch meeting with the afore-referenced ESU employee and discussed the information that the employee had provided to Isaac Sanders.

98.   In that meeting, the ESU employee informed Victoria Sanders that: Bolt had made several general accusations about Isaac Sanders concerning improper financial conduct and confrontations with Advancement

Office personnel; Bolt was having Sanders "investigated" and that Bolt felt that she could get Isaac Sanders' job if he was fired and that Bolt had been working with the East Stroudsburg University Council of Trustees and the University Foundation Board.

99.    Between December 6, 2007 – the date that Victoria Sanders met with Isaac Sanders and the employee – and December 11, 2007, the date that Dillman, Victoria Sanders, and Carolyn Bolt met to address the employee's accusations concerning Bolt; Victoria Sanders shared with President Dillman what she had learned from the employee.

100. The employee's information referred to issues in the Advancement Office and that the Diversity Director was investigating a complaint made by a student regarding sexual harassment.

101. On December 11, 2007, President Dillman, and Dr. Victoria Sanders met with Carolyn Bolt.  The meeting focused on the accusations that the employee had made against Bolt and the management of the Advancement Office.   However, at one point during the meeting, Defendant President Dillman asked Bolt if she knew anything about anonymous letters.

102. At no point in this meeting did Carolyn Bolt discuss improper sexual conduct by Isaac Sanders involving any of the student workers in the Advancement Office or students generally.

103.   Despite the information provided by Bolt, Defendant Dillman and PASSHE forwarded the anonymous letters to the FBI in December 2007 knowing full well that Carolyn Bolt, the main accuser of Dr. Isaac Sanders, had no information of any sexual misconduct.

**8.      President Dillman Determines that there is Insufficient Evidence that the Complaining Student was Harassed**

104.   As stated above, on January 7, 2008, Defendant President Dillman sent his written decision to the student who filed the complaint with the Diversity Office in August 2007.

105.   Presumably, the FBI was investigating the conduct of Isaac Sanders at this time.

106.   **Despite clearance by Defendant Dillman in the lone student complaint, Isaac Sanders was not automatically reinstated to his position as he should have been since there was no basis or foundation for any of the allegations leveled against him absent malicious rumor, innuendo, and gossip.**

107.   By not returning Dr. Sanders to his position of employment within the University, a clear and distinct message that Dr. Sanders was guilty and responsible for the sexual conduct and theft that he was accused of despite the findings of the investigation and audits.   This message was sent

21

throughout the University community and geographical area surrounding ESU.

108.   The spectre of guilt has continued hang over Isaac Sanders that he was somehow responsible for the inappropriate sexual conduct with a student as well as theft and the failure of Dr. Dillman to return him to his position gave fuel to this assessment of guilt.

109.   The conduct of the Defendants has been continuing since his 2009 termination through 2018 as discussed more fully below.

110.   In October 2007, the second anonymous letter was sent to the University and published in local media.   The letter alleged sexual liaisons between Isaac Sanders and students.   The implication by the anonymous letter was that Isaac Sanders was a sexual predator preying on students at East Stroudsburg University.

111.   It was impossible for Dr. Sanders to combat this malicious smear campaign undertaken against him and the impact on his reputation was devastating.

112.   The Defendants have done nothing from 2007 to date to clear the reputation of Dr. Sanders but rather their continuing course of conduct has only fueled the reputational damage to Dr. Sanders.

### 9.   <u>Second Investigation</u>

113.  In January 2008, members of the staff of Dr. Isaac Sanders raised accusations concerning alleged harassment, favoritism towards minorities, unauthorized scholarships, and misappropriation of University funds.   This was solely an internal University matter that should have been handled within the University.

114.  In January 2008, after Defendant Borland assumed his position as Acting President with Defendant Dr. Dillman on a semester long sabbatical, Borland had a series of meetings with staff from the Advancement Office.

115.  These meetings involved complaints about management of the Advancement Office and alleged mistreatment of full time staff.

116.  The implication sent out throughout the University community is that the meetings held by Interim President Borland into these interoffice management office matters somehow related to the unfounded allegations of sexual misconduct against Dr. Sanders and financial misdeeds.

117.  The Defendants have never corrected this appearance but rather by their continued course of conduct, up to and including 2018, have reaffirmed the belief that Dr. Sanders is guilty of sexual misconduct with students and theft.

118.  In January 2008, Defendant Borland, acting in his capacity as

Acting University President, spoke with the Chair of the Board of Trustees at the University to discuss rumors circulating in the University community about Sanders' alleged sexual misconduct which she and other Trustees were hearing.

119. On January 14, 2008, Borland met with Carolyn Bolt. In that meeting, Bolt related her issues with Isaac Sanders' management style. Bolt also commented on her perception of the mid-December 2007 meeting with President Dillman and Victoria Sanders.

120. Carolyn Bolt left the Advancement Office for one year to serve as assistant to the President but choose to return to the Advancement Office in 2007 rather than staying in the President's office.

121. Bolt's desire to return to the Advancement Office headed by Plaintiff Sanders was odd for someone who had questioned Isaac Sanders' management style.

122. Bolt also told Defendant Borland that he might want to inquire with the members of the University Council of Trustees and Foundation Board to confirm that she had not been in contact with them about Isaac Sanders during her meeting with Dillman in December, 2007.

123. Bolt had told Dillman in 2007 that she had only been in touch with members of the Council of Trustees and Foundation Board strictly about

University business and that she had not been in touch with the members about her issues with Isaac Sanders.

### 10. Internal University Complaints by Students Published in the Local Newspaper

124. On June 8, 2008, the *Pocono Record* ran a story that there were additional students who were coming forward and claiming that Isaac Sanders had sexually harassed or abused them.

125. The newspaper had secured at least one of the anonymous letters.

126. **After discussing the matter with University counsel, and Thomas Krapsho, the State System's Vice Chancellor for Human Resource and Labor Relations, Defendant President Dillman placed Isaac Sanders on administrative leave solely based on malicious innuendo rumors and gossip.**

127. The decision to place Isaac Sanders on administrative leave was made jointly between President Dillman and Defendant PASSHE.

128. Also in June 2008 in response to the newspaper article which was grounded in malicious innuendo, rumors and gossip, Defendant PASSHE made a determination to hire an outside law firm to conduct an "investigation" into the anonymous allegations being reported in the *Pocono Record*.

129. *Black & Gerngross*, a Philadelphia law firm, was hired by PASSHE and East Stroudsburg University to conduct an "investigation" into the anonymous allegations that Isaac Sanders engaged in inappropriate sexual conduct with University students and committed financial improprieties with funds of the East Stroudsburg University Foundation.

130. The "investigation" was nothing more than a pre-determined exercise to terminate Dr. Isaac Sanders from his position with the University.

131. On information and belief, PASSHE has a practice of terminating employees within its University system in this improper manner.

132. The "investigation" despite University policy, was based entirely on malicious innuendo, rumors and gossip contained within an anonymous letter.

133. On information and belief, the "investigation" was nothing more than a pre-textual exercise as the investigator merely met with the attorney for the plaintiffs in the later filed civil rights matter and regurgitated the opinions and belief of the attorney for the student plaintiffs.

134. No interviews with the complaining students were conducted, memorialized or cited in the final report following the "investigation".

135. The so called "investigation" by the Philadelphia based law firm never resulted in an interview of Dr. Sanders most vocal critic and employee

in the Development Office, Carolyn Bolt.

136. Ms. Bolt had left University employment amid peculiar and financially beneficial terms.

137. The continued public perception from the conduct of the Defendants at the outset and during the "investigation" was that Isaac Sanders was "guilty" of sexual assault on students and theft.

138. By letter dated July 1, 2008, twenty two days after the newspaper article premised on anonymous complaints and merely days following the retention of the outside law firm, Isaac Sanders was placed on administrative leave effectively immediately.

139. The letter instructed Isaac Sanders that, absent prior approval by President Dillman or Victoria Sanders, he was not permitted on campus, nor could he contact any University employee, student, donor or potential donor.

140. The suspension of Isaac Sanders, without one human being coming forward to make a complaint against him, circulated within the University community with the assessment of guilt in student sexual assaults and theft.

141. Despite the fact the so called "investigation" had recently commenced, the presumption of innocence and his status as a Commonwealth employee, Sanders suspension sent a loud and clear

message to all in the University community and geographical community that he was guilty of the sexual abuse of students and theft like behavior.

142.  The import of action by Defendants PASSHE, ESU, and President Dillman in placing Isaac Sanders on immediate administrative leave within days of the *Pocono Record* article was to label him guilty as a sexual predator who targeted University students.

143.  Sanders was in effect declared guilty of the allegations by the actions of Dillman and Defendant PASSHE.

## 11.  News Stories on Isaac Sanders Spawn Additional Complaints

144.  During the summer of 2008, after the *Pocono Record* article and while Isaac Sanders was on administrative leave, the University was notified through the attorney representing the original complaining student, that five former students were going to bring claims against the University.

145.  This information was a regurgitation of facts published by the Pocono Record in June 2008.

146.  The five former students generally alleged that they were students at the University from the Fall of 2004 to the Spring of 2007.

147.  It would be alleged, according to their attorney, that on various occasions, Isaac Sanders engaged in appropriate sexual conduct with them.

148.  Dr. Isaac Sanders has always denied these allegations and

successfully defended same.

149.   These anonymous students with unspecified allegations against Dr. Sanders had never filed a complaint against Dr. Sanders with the University's Office of Diversity, the Pennsylvania Human Relations Commission, the federal Equal Opportunity Employment Commission or with any state or federal law enforcement agency.

150.   Rather, these students and their publicity starved attorney were caught up in the malicious rumor, gossip and innuendo spewed against Dr. Sanders and confirmed by the actions of all Defendants.

151.   **The second investigation conducted by PASSHE and the University failed to reveal any merit to the allegations leveled against Dr. Sanders.**

152.   **By not returning Dr. Sanders to his position of employment within the University, a clear and distinct message was sent throughout the University community and to the geographic region surrounding the University that Dr. Isaac Sanders was a student sexual predator and thief for the conduct he was anonymously accused of despite the findings of the investigation.**

153.   Isaac Sanders was not automatically reinstated to his position as he should have been since there was no foundation for any of the allegations

leveled against him or a person to voice them.

154.  Dr. Sanders was deemed guilty by PASSHE and the University without due process and he was stigmatized by the Defendants' conduct.

155.  Dr. Sanders, to date, has never been provided a name clearing hearing as mandated by law.

## 12.   Third Investigation

156.  In the summer of 2008, following the alleged "investigation", Counsel for PASSHE concluded that sufficient evidence of sexual harassment existed despite previous conclusions of the first two investigations conducted by President Dillman, Provost Borland, and/or their designees.

157.  Outside counsel for PASSHE was retained purportedly to conduct an "investigation" and though the result was predetermined, counsel exceeded the scope of his authority by making long predetermined conclusions.

158.  Although the report of the third investigation was never publically disclosed under the privilege of PASSHE work product, the findings of the investigation were well known in the University and geographical communities and disseminated to the public and press outlets.

159.  First and foremost, the Philadelphia based law firm hired by

PASSHE to conduct this third "investigation" boasted on the firm's website of their expertise in conducting investigations into discrimination, fraud, and sexual misconduct.

160. It had been reported in University community and in the newspaper of general circulation in East Stroudsburg, Pennsylvania by PASSHE spokesman Ken Marshall that any "criminal activity" that might surface in the PASSHE investigation would be referred to the District Attorney or the Office of the Attorney General thereby implicating Dr. Sanders in non-specified and uncharged criminal conduct.

161. The import of this press statement was that the investigation concerned criminal conduct by Dr. Sanders as it related to student complaints of sexually inappropriate conduct.

162. It was reported publically that the University terminated Sanders after the PASSHE investigation as somehow this third investigation corroborated "claims against him of inappropriate conduct" according to an internal ESU email acquired by a local news organization through a Right-to-Know Request.

163. This statement attributable to the PASSHE third investigation, despite exoneration in earlier investigations, publically made false statements and found Dr. Isaac Sanders guilty of sexually inappropriate

conduct with students in the court of public opinion based only in rumor and gossip.

164.   The continued public perception from the conduct of the Defendants at the outset, during and at the conclusion of the "investigation" was that Isaac Sanders was "guilty" of sexual assault on students and theft.

165.   The PASSHE and University Report of retained counsel and the conduct of all Defendants, has ruined the well-earned academic reputation and personal reputation of Dr. Sanders.

166.   At the time of the so-called "investigation" by outside counsel, Dr. Sanders had no violated any provision of law or policy.   The outcome of the "investigation" was predetermined.

167.   All Defendants here are state entities or employees of state entities and their actions here were done under color of state law.

168.   As the Defendants were all state entities or employees of state entities, they were required not to violate the constitutional rights of others including Isaac Sanders.

169.   The so-called investigator who was retained by PASSHE and the University relative to Isaac Sanders, on information and belief, counseled the Defendants University, PASSHE and Dillman as it relates to the termination of Dr. Sanders.   This was plainly unjust.

### 13.   Comments by Pennsylvania Governor Rendell

170. On or about February 26, 2009, despite the presumption of innocence afforded Dr. Sanders by the United States Constitution, his consistent denial of any untoward conduct attributable to him, clearance by multiple investigations conducted pursuant to University protocols, then Governor Edward Rendell made public statements that conveyed to students and the general community that Dr. Sanders had committed the conduct as alleged and that he was liable for same.

171. In February 2009, then Governor Rendell told over two hundred students who had gathered on the ground floor of the Science and Technology Center that "these are serious charges" and "you have a right to know why this was allowed to go on."

172. The above quoted statements by the Governor of Pennsylvania, who served as a Board Member of PASSHE, conveyed to all that Isaac Sanders had done the horrible sexually assaultive things which he was accused of.   The comments of former Governor Rendell were picked up in the local print media as well as being published on local news stations.

173. It was reported and widely conveyed that Rendell, a former Philadelphia prosecutor, described the allegations made against Sanders as "criminal" acts.

174. The continued public perception from the conduct of the Defendants following the public comments of PASSHE Board member Rendell was that Isaac Sanders was "guilty" of sexual assault on students and theft.

## 14.  ESU Terminates Isaac Sanders' Employment

175. President Dillman received the third "investigation report" from PASSHE's outside law firm on September 26, 2008.

176. Following receipt of the report, Dillman conducted a conference with Isaac Sanders on October 3, 2008.

177. The focus of the conference was highly pre-textual and the stated reasons for his potential termination were designed to mask the true intent of Dillman and PASSHE to terminate Sanders for the allegations of sexual conduct swirling around in the University community by gossip and innuendo.

178. The Conference with Dillman and Isaac Sanders was orchestrated by PASSHE counsel who took repeated breaks to consult with Dillman so that the conclusion reached was inevitable.

179. Plaintiff Isaac Sanders' employment with ESU was suspended on July 1, 2008.

**STIGMA PLUS**
**October 22, 2008**

### Reputational Harm
### Investigations convey Sanders is Serial Sexual Predator and
### Thief---Termination of Employment

180. Isaac Sanders was terminated on October 22, 2008, to be effective December 21, 2008.

181. On October 22, 2008, Dillman sent Isaac Sanders a letter stating that his employment with the University was being terminated.

182. The letter sets forth the reasons for the termination which were not only inaccurate and pre-textual but masked the true motivation of the Defendants PASSHE and Dillman to get rid of Sanders at all costs.

183. The articulated inaccurate and pre-textual reasons for the termination are as follows:

   a. "some of the allegations involve your conduct toward ESU students."

   b. "Other allegations concern financial matters."

   c. The student conduct matters cited by Dr. Dillman and PASSHE concern sexual advances or conduct by Isaac Sanders despite the fact that Sanders had been exonerated by Dillman in the University investigation and subsequently in every investigation and judicial proceeding conducted.

   d. The "financial matters" consisted of a mistaken deposit by a

University employee into the wrong ESU Foundation bank account and the payment of a student balance on request by a University employee. The student balance issue concerned a former student who could not pay his University balance which was necessary for his degree and in turn critical to his hiring as a teacher in a local school district.

e. The contact to a University Trustee centered upon condolences Dr. Sanders conveyed following the death of the Trustees family member.

184.    The Letter of October 22, 2008 instructed Isaac Sanders to return all University property and documents by October 22, 2008.   It further stated that per Isaac Sanders' employment agreement with ESU, the termination would be effective December 21, 2008.

185.  The continued public perception from the conduct of the Defendants at the time of Sanders' termination and to date was that Isaac Sanders was "guilty" of sexual assault on students and theft.

186.  The termination letter not only cast Isaac Sanders as a sexual predator with students but introduces a new assertion that he is a thief as it related to "financial matters".

187.  The termination "for cause requirement" was emasculated by the

Dillman and PASSHE and Dr. Isaac Sanders has an entitlement to continued employment.

188. Dr. Sanders' loss here constitutes a "grievous loss."

189. Isaac Sanders has a liberty interest to re-employment based upon the manner in which PASSHE has handled factually similar situations with other individuals employed at universities within the Commonwealth of Pennsylvania.

190. The termination of Dr. Isaac Sanders was flawed in that the student contact assertion was inaccurate and wrong.

191. The only student who filed a complaint against Isaac Sanders saw that complaint dismissed.

192. The "other" students were unnamed and not identified but were merely floating around in malicious rumor, gossip and innuendo. No due process was afforded to Isaac Sanders.

193. The other reasons articulated by Dillman and PASSHE for the termination of Dr. Sanders' employment were not only pre-textual but were factually incorrect and wrong.

194. The consistent message by the conduct Defendants from the time of Dr. Sanders separation from employment to present go well beyond allegations of improper and inadequate job performance, incompetence,

neglect of duty or malfeasance.

195.  To date, the Defendants did nothing to comment, correct or clear the stigmatizing impact this had on Isaac Sanders.

## 15.  Allegations Against Sanders Reviewed by All Law Enforcement Agencies

196.  On information and belief, it is asserted that law enforcement agencies such as the Monroe County District Attorney's Office, the Pennsylvania Attorney General's Office, the United States Department of Justice and the Federal Bureau of Investigation have all investigated the allegations made against Isaac Sanders during and after his termination from employment and have determined no prosecutorial merit to any charges.

197.  No criminal charges have ever been filed against Isaac Sanders.

198.  The continued public perception from the conduct of the Defendants in contacting all possible law enforcement agencies, state and federal, was that Isaac Sanders was "guilty" of sexual assault on students and theft.

## STIGMA PLUS
### February 2009
### Reputational Harm
### Litigation Against Isaac Sanders and Stand Alone Defense

199.  In addition to the allegations made against Isaac Sanders and

vigorously defended by him, Sanders was subject to a civil rights suit removed to the United States District Court for the Middle District of Pennsylvania.

200.  The lawsuit filed by six students of the University was initially filed in February of 2009 in the Court of Common Pleas of Monroe County Pennsylvania and removed to the United States District Court for the Middle District of Pennsylvania on March 20, 2009 (No. 3:09-cv-525).

201.  From the date of removal and docketing on March 20, 2009 to the date of the Jury's Verdict on October 31, 2014, two hundred and eleven docket entries were lodged over a period of five years and seven months.

202.  On each day and with each filing, the defendants failed to afford Isaac Sanders either a defense or an agreement to indemnify him to which he was entitled to under state law and this constituted a continuing violation.

203.  The continued public perception from the lawsuit and the fact Commonwealth was not defending Isaac Sanders in the District Court proceedings was that Isaac Sanders was "guilty" or "responsible" of sexual assault on students and theft.

204.  **Isaac Sanders had an unquestionable constitutionally protected liberty interested in his reputation.**

205.  The actions of all Defendants horribly stigmatized and impugned

Isaac Sanders good name, reputation, honor, and integrity.

206.  **Isaac Sanders paid his own money to defend the civil rights suit**.

207.  **Isaac Sanders has never been provided notice and opportunity to be heard against his accusers prior to the civil rights litigation and he had never been provided, to date, a name-clearing hearing.**

208.  Despite all named University officials being provided a defense by the Office of Attorney General in the Middle District litigation and in light of the fact that the allegations concerned conduct attributable to Dr. Sanders in his position of employment with the University, it was unconscionable for the Commonwealth of Pennsylvania not to provide Dr. Sanders a defense.

209.  Pennsylvania law indicates, under the circumstances presented, that Dr. Isaac Sanders should have been provided a defense and indemnification in regard to the civil suit filed by the six former students in the United States District Court for the Middle District of Pennsylvania.

210.  The defendants continued to violate the due process rights of the Plaintiff each and every day from the date of removal to the date of the verdict.

211.  The Pennsylvania Attorney General should have sought the

assignment of conflicts counsel and provided Dr. Isaac Sanders a defense from the outset of the civil rights litigation advanced against him in the United States District Court for the Middle District of Pennsylvania.

212.  Dr. Sanders retained a Stroudsburg Pennsylvania attorney to counsel him at and subsequent to the time of his employment termination.

213.  To date, the Defendants did nothing to comment, correct or clear the stigmatizing impact this had on Isaac Sanders.

## STIGMA PLUS
## May 26, 2009
## Reputational Harm

214.  On May 26, 2009, the President of East Stroudsburg University, despite absolutely no foundation or proof, beyond rumor and gossip, stated that Isaac Sanders, who was accused of student sexual assault and theft, did in fact act inappropriately (See Exhibit "A" attached hereto).

215.  This afore-referenced statement of the University was made despite all investigations clearing him of wrongdoing.

216. Isaac Sanders has a right, under Pennsylvania law, not to be defamed. Statements that characterize one as a thief are capable of a defamatory meaning as a matter of law. See *Smith v. Wagner*, 403 Pa. Super. 316, 322 (Pa. Super Ct. 1991).

217. To date, the Defendants did nothing to comment, correct or clear

the stigmatizing impact this had on Isaac Sanders.

**STIGMA PLUS**
**May 31, 2009**
**Reputational Harm**

218.   On May 31, 2009, an Editorial in the *Pocono Record* advanced a position that East Stroudsburg University had "failed badly" in keeping up with its mission to upholding its values. The Office of the Governor of Pennsylvania commented upon the deployment of a technical statute of limitations defense in a Motion to Dismiss. A Spokesman from the Governor's Office **commented several times** that the Commonwealth is not representing Isaac Sanders but only the other named defendants (See Exhibit "B" attached).

219.   The statement afore-referenced conveyed to all that Isaac Sanders was guilty or responsible for the student assaults and theft he was accused of.

220.   Isaac Sanders has a right, under Pennsylvania law, not to be defamed. Statements that characterize one as a thief are capable of a defamatory meaning as a matter of law. See *Smith v. Wagner*, 403 Pa. Super. 316, 322 (Pa. Super Ct. 1991).

221.   To date, the Defendants did nothing to comment, correct or clear the stigmatizing impact this had on Isaac Sanders.

**STIGMA PLUS**
**February 1, 2011**
**Reputational Harm and Property loss**

222.  Dr. Sanders paid a Stroudsburg attorney professional fees from July 2008 through March 2009 in regard to the student litigation.

223.  Dr. Isaac Sanders had to retain private counsel in March 28, 2011 to defend him in the civil rights claims advanced unsuccessfully by the former students.

224.  Isaac Sanders paid professional fees to retained counsel to defend the civil rights claim in April 2011 and September 2014.

225.  Isaac Sanders contractual relationship with counsel had an "ascertainable monetary value."

226.  Isaac Sanders spent his own funds for travel, lodging, and costs related to defending the civil rights litigation unsuccessfully advanced by the former students from 2010  to the October 31, 2014 Verdict.

227.  The entitlement to a civil defense and indemnification of Isaac Sanders was mandatory and not discretionary based on the allegation contained in the civil rights suit advanced against ESU, Isaac Sanders, and other University defendants.

228.  The failure to provide a defense to Dr. Sanders sent a clear and convincing message to all that the University and PASSHE found Dr.

Sanders guilty of unspecified and unsupported allegations of inappropriate student conduct and financial misdeeds without any opportunity for defense.

229.   On November 20, 2011, an Opinion was published in the Pocono Record comparing the conduct of Isaac Sanders to disgraced and convicted child molester, former Penn State Football Assistant Coach Jerry Sandusky. This article represented the mindset of the East Stroudsburg area community and was a continuing insult to the reputation of Dr. Sanders. Justice demands he be afforded an opportunity to secure justice for the all the wrongs done to him and outlined herein (See Exhibit "C" attached).

230.   The continued public perception from the conduct of the Defendants in not including Dr. Isaac Sanders as part of the defense provided by the Office of the Pennsylvania Attorney General was that Isaac Sanders was "guilty" of sexual assault on students and theft.

231.   The failure to provide Dr. Sanders a defense by the Office of Attorney General and the dissemination of parts of the PASSHE Report and the sordid implications from it have ruined the well-earned academic reputation and personal reputation of Dr. Sanders.

232.   Isaac Sanders had to retain counsel on his own who provided him a defense separate and apart from the well-funded, free and immunity cloaked defendants who were part of the "University Defendants" in the

complex and protracted civil rights claim.

233.   The federal civil rights matter was commenced in February 2009 in the Court of Common Pleas of Monroe County Pennsylvania (No. 1336-CV-2009).

234.   No efforts were made to promptly serve the Defendants with the lawsuit. However, the Complaint was provided to the *Pocono Record* and the allegations were promptly published.

235.   The continued public perception from the conduct of the Defendants following the press on the lawsuit was that Isaac Sanders was "guilty" of sexual assault on students and theft.

236.   Isaac Sanders consistently has denied any inappropriate behavior or conduct in regard to these students and he vigorously defended the lawsuit.

237.   The civil rights matter filed in Monroe County Court of Common Pleas was removed to the United States District Court for the Middle District of Pennsylvania on March 20, 2009 (No. 09-Cv-0525).

238.   From March 20, 2009 to October 31, 2014, the date of the verdict in the civil rights matter, there were 209 docket entries.

239.   The continued public perception from the conduct of the Defendants in not providing Isaac Sanders a defense from the outset of the

suit to the date of the verdict on October 31, 2014, was that Isaac Sanders was "guilty" of sexual assault on students and theft.

240.   Isaac Sanders, in addition to the legal fee obligations incurred, faced paying a monetary judgment in the event he was found liable in the civil rights suit which he defended vigorously.

241.   During the federal litigation Sanders was forced to defend, due to mounting debt from a failure to secure suitable employment, Isaac Sanders was forced to file for bankruptcy protection in the United States Bankruptcy Court for the Middle District of Pennsylvania on August 20, 2009.

242.   The civil rights litigation was stayed pursuant to the provisions of the bankruptcy code and an Order staying the litigation entered October 26, 2009.

243.   The bankruptcy stay was lifted by Order of April 16, 2010.

244.   To date, the Defendants did nothing to comment, correct or clear the stigmatizing impact this had on Isaac Sanders.

**STIGMA PLUS**
**June 2013**
**Reputational Harm**

245.   In June 2013, the Pocono Record ran a story that publically revealed the favorable employee reviews of Isaac Sanders and his financial information in terms of a raise in relationship to him being placed on leave

regarding sexual harassment of students (See Exhibit "D" attached).

246.  Dr. Sanders possessed a privacy right in his employment file and the disclosure of same violated said right.

247.  The Commonwealth Defendants were dismissed following a Motion for Summary Judgment filed by the Pennsylvania Attorney General's Office.

248.  The continued public perception from the conduct of the Defendants in not providing Isaac Sanders a defense or seeking his dismissal with the same vigor utilized with other University Defendants was that Isaac Sanders was "guilty" of sexual assault on students and theft.

249.  To date, the Defendants did nothing to comment, correct or clear the stigmatizing impact this had on Isaac Sanders.

### STIGMA PLUS
### June 2013
### Reputational Harm

250. In June 2013, the *Pocono Record* asked readers in the East Stroudsburg area to help view online thousands of pages following a favorable ruling by the Pennsylvania Supreme Court for the *Pocono Record* The theme in June 2013 was that the "ESU Foundation records may hold clues to Sanders scandal" (See Exhibit "E" attached).

251. Readers of the *Pocono Record* were encouraged to go online to

look for evidence that Isaac Sanders traded ESU scholarships for sexual favors and money.

252. East Stroudsburg University or PASSHE never publicly defended Isaac Sanders and denied these defamatory assertions.

253. This was another personal attack against Isaac Sanders portraying him as a sexual predator and thief. This was a continued stigmatization of Sanders by the University and PASSHE.

254. To date, the Defendants did nothing to comment, correct or clear the stigmatizing impact this had on Isaac Sanders.

**STIGMA PLUS**
**July 1, 2013**
**Reputational Harm**

255. On July 1, 2013, the deposition of University President Robert Dillman's deposition was made public and available to the *Pocono Record* (See Exhibit "F" attached). Isaac Sanders was viewed by President Dillman who was questioned at deposition on letters that implied Isaac Sanders engaged in gay relationships. Dillman, on the advice of PASSHE counsel, shared the letters with Isaac Sanders who has steadfastly denied any inappropriate, illegal, unethical, criminal conduct or gay relationships attributable to him.

256. To date, the Defendants did nothing to comment, correct or clear

the stigmatizing impact this had on Isaac Sanders.

**STIGMA PLUS**
**July 8, 2013**
**Reputational Harm**
**Sanders as a Thief and Allegation of Missing Funds from ESU**
**Foundation**

257. On July 8, 2013, documents were filed with this Court that personally attacked the management style of Isaac Sanders in the University's Advancement Office yet intimated he was responsible for theft of services (See Exhibit "G" attached).

258. Isaac Sanders has a right, under Pennsylvania law, not to be defamed. Statements that characterize one as a thief are capable of a defamatory meaning as a matter of law. See *Smith v. Wagner*, 403 Pa. Super. 316, 322 (Pa. Super Ct. 1991).

259. To date, the Defendants did nothing to comment, correct or clear the stigmatizing impact this had on Isaac Sanders.

**STIGMA PLUS**
**July 29, 2013**
**Reputational Harm**
**Sanders as a Thief and Allegation of Missing Funds from ESU**
**Foundation**

260. On July 29, 2013, *The Pocono Record* ran a story that

$250,000.00 was missing from the ESU Foundation at a time when Isaac Sanders headed that arm of East Stroudsburg University as its Executive Director (See Exhibit "H" attached).

261. The University, PASSHE or the ESU Foundation never commented publically that these allegations were incorrect. This is especially pronounced when annual audits and a specially requested forensic audit for the ESU Foundation found no money missing, stolen or unaccounted for.

262. Isaac Sanders has a right, under Pennsylvania law, not to be defamed. Statements that characterize one as a thief are capable of a defamatory meaning as a matter of law. See *Smith v. Wagner*, 403 Pa. Super. 316, 322 (Pa. Super Ct. 1991).

263. To date, the Defendants did nothing to comment, correct or clear the stigmatizing impact this had on Isaac Sanders.

### STIGMA PLUS
### September 25, 2013
### Reputational Harm

264.   On September 25, 2013, an Editorial in the *Pocono Record* implied that Isaac Sanders took money during his tenure as the ESU Foundation Executive Director and it was related to sexually predatory conduct with students (See Exhibit "I" attached).

265.   This implication that Isaac Sanders was a thief was a repeated theme ever since PASSHE and the University separated Sanders from the University.

266.   Isaac Sanders has a right, under Pennsylvania law, not to be defamed. Statements that characterize one as a thief are capable of a defamatory meaning as a matter of law. See *Smith v. Wagner*, 403 Pa. Super. 316, 322 (Pa. Super Ct. 1991).

267.   To date, the Defendants did nothing to comment, correct or clear the stigmatizing impact this had on Isaac Sanders.

**STIGMA PLUS**
**April 16, 2014**
**Reputational Harm**

254.   On April 16, 2014, this Court dismissed all claims in the student's civil rights claim against ESU and President Dillman. The claims against Isaac Sanders remained (See Exhibit "J" attached).

255.   PASSHE commented that they were pleased with the ruling that dismissed ESU and President Dillman. A PASSHE spokesman commented: "My understanding is that the only thing that's left are the **charges** against Isaac Sanders himself (See Exhibit "J" attached).

256.   The statement that "charges" were either pending or remain against Dr. Sanders was more insult against Dr. Sanders by PASSHE

that inferred that criminal charges were pending or remain against Isaac

Sanders when none were ever filed. This was a further stigmatization

against the reputation of Isaac Sanders.

257.    Isaac Sanders has a right to his reputation under

Pennsylvania law.

258.   The Defendants did nothing to comment, correct or clear the

stigmatizing impact this had on Isaac Sanders.

## EXONERATION OF ISAAC SANDERS

259.     Following a lengthy jury trial, a verdict was entered in favor

of Isaac Sanders and against the Plaintiffs on October 31, 2014.

## STIGMA PLUS
## November 1, 2014
## Reputational Harm
## Sanders Never Provided a Defense in the Appeals following the
## Favorable Verdict

260.  Following the denial of post-trial relief sought by the Plaintiffs, an

Appeal was taken to the United States Court of Appeals for the Third Circuit.

261.  On each day and with each filing, the defendants failed to afford

Isaac Sanders either a defense or an agreement to indemnify which he was

entitled to under state law and this constituted a continuing violation.

262.  The continued public perception from the appeal and the fact

Commonwealth was not defending Isaac Sanders in the Third Circuit appeal

was that Isaac Sanders was "guilty" of sexual assault on students and theft.

263.  On September 21, 2017, the United States Court of Appeals for the Third Circuit denied the Plaintiffs' Appeal.   A request for Re-Hearing *En Banc* was also denied.

264.  To date, the Defendants did nothing to comment, correct or clear the stigmatizing impact this had on Isaac Sanders.

265.  The events as detailed above, continuing as separate and distinct stand-alone events by the affirmative acts of the defendants were the proximate result of the conduct of the defendant.

266.  These events, detailed above, are not the ill effects or hangover from the termination of Isaac Sanders at the University but rather are new, separated and distinct events based upon the affirmative conduct of the events set forth in the preceding paragraphs.

**STIGMA PLUS**
**September 22, 2017**
**Reputational Harm**
**Sanders Never Provided a Defense in the Appeals to United States Supreme Court**

267.  Despite the fact that Dr. Sanders was cleared by a jury of his peers in the United States District Court for the Middle District of Pennsylvania, the investigation done by the Diversity Director at East Stroudsburg University, two investigations conducted by the University, it

was the conduct of the Defendants that has forever scarred the well-earned reputation of Dr. Sanders and which has damaged him immensely.

268.   Plaintiff's in the civil rights claim against Isaac Sanders appealed the adverse Verdict to the United States Court of Appeals for the Third Circuit.

269.   The Third Circuit Court of Appeals affirmed the District Court in an Opinion and Order issued on August 16, 2017.

270.   The Plaintiff's in the civil rights claim against Isaac Sanders filed a Petition for a Writ of Certiorari in the United States Supreme Court on December 12, 2017.

271.   On each day and with each filing in the federal appellate courts, the defendants failed to afford Isaac Sanders either a defense or an agreement to indemnify which he was entitled to under state law and this constituted a continuing violation.

272.   The Commonwealth of Pennsylvania through the Office of the Attorney General represented all defendant/appellees in the United States Supreme Court other than Dr. Isaac Sanders.

273.   The continued public perception from the conduct of the Defendants in not providing Dr. Sanders a defense in the United States Supreme Court was that Isaac Sanders was "guilty" of sexual assault on

students and theft.

274.  On February 20, 2018, the United States Supreme Court denied the Petition for a Writ of Certiorari.

275.  To date, the Defendants did nothing to comment, correct or clear the stigmatizing impact this had on Isaac Sanders at that time.

276.  The events as detailed above, continuing as separate and distinct stand-alone events by the affirmative acts of the defendants were the proximate result of the conduct of the defendant.

277.  These events, detailed above, are not the ill effects or hangover from the termination of Isaac Sanders at the University but rather are new, separated and distinct events based upon the affirmative conduct of the events set forth in the preceding paragraphs.

### 17.  <u>Loss of Reputation and Job Opportunities</u>

278.  Isaac Sanders as a result of the allegations made against him and confirmed by PASSHE and all Defendants has been fully exonerated.

279.  Despite the exoneration in a court of law, Dr. Sanders has been forever damaged by the allegations made against him.

280.  On December 12, 2014 the Pennsylvania Attorney General on behalf of the University Defendants and citizens of the Commonwealth of Pennsylvania, filed a Bill of Costs against the unsuccessful plaintiffs in the

United States District Court in the Middle District of Pennsylvania.

281.  The Attorney General's Office files a Bill of Costs as a matter of course or "standard procedure" in all civil rights cases that it defends.

282.  The events as detailed above, continuing as separate and distinct stand-alone events by the affirmative acts of the defendants were the proximate result of the conduct of the defendant.

283.  These events, detailed above, are not the ill effects or hangover from the termination of Isaac Sanders at the University but rather are new, separated and distinct events based upon the affirmative conduct of the events set forth in the preceding paragraphs.

### STIGMA PLUS
### July 25, 2018
### Reputational Harm
### Sanders Viewed as Sexual Predator by Pennsylvania Attorney General

284.  The Pennsylvania Attorney General in 2018 issued an apology to the unsuccessful plaintiffs who accused Dr. Sanders of sexual assault. The import of this was that the Attorney General of Pennsylvania believed Sanders guilty or responsible for sexual assault and that the Plaintiff were therefore victims.

285. A nationally syndicated news article on this issue was titled "Pennsylvania Apologizes to Accusers."

286.  The import of this action by the Attorney for East Stroudsburg and the University Defendants which resulted in a Motion to Vacate the award of the Bill of Costs filed July 25, 2018 was another governmental action designed solely to convey that Isaac Sanders was guilty of student sexual assault.

287.  The continued public perception from the comments of the Pennsylvania Attorney General as well as the withdrawal of the Bill of Costs was that Isaac Sanders was "guilty" of sexual assault on students.

288.  The Defendants did nothing to comment, correct or clear the stigmatizing impact this had on Isaac Sanders.

289.  The allegations of the Plaintiff Isaac Sanders set forth above constitutes a continual series of unlawful acts by the Defendants which horribly destroyed his reputation.

290.  The Defendants have done nothing, to date, to attempt to redress or abate the reputational harm inflicted on Isaac Sanders.

291.  The harm to Plaintiff Isaac Sanders was gradual and occurred on a repetitive and continuing basis from his last date of employment to present.

292.  The Defendants cannot be afforded an open ended license to continue to impugn the integrity and rights of Dr. Sanders which have never been cleared or addressed to date.

293.  The actions of the Defendants have resulted in Dr. Sanders to be continuously viewed as a sexual predator and thief.

294.  The Defendants, at each stage, over the timeframe above, engaged in conduct above-referenced independent and separate consideration of the reputational treatment of Isaac Sanders.

295.  The Defendants' concerted conduct as to Isaac Sanders was recently published on October 1, 2018 when Isaac Sanders was linked to Pennsylvania's clerical abuse scandal.

296.  In August 2014 based on the conduct of the Defendants, Isaac Sanders was linked in news reporting to Pennsylvania's most heinous child predator, former Penn State University Football Coach Jerry Sandusky.

297.  When the appeal was filed by the unsuccessful plaintiffs to the United States Court of Appeals for the Third Circuit, it generated press that specifically indicated that Dr. Sanders was not represented by the Pennsylvania Attorney General.

298.  When the appeal was filed by the unsuccessful plaintiffs to the United States Supreme Court, it generated press that specifically indicated that Dr. Sanders was not represented by the Pennsylvania Attorney General.

299.  Despite the jury in the United States District Court for the Middle District of Pennsylvania clearing Dr. Isaac Sanders in a Verdict that issued

on October 31, 2014, the unfounded allegations against Dr. Sanders solely based upon the collective conduct of the Defendants resulted in a March 2016 Temple American Inns of Court seminar entitled "Sexual Misconduct on Campus" in which the litigation against Dr. Sanders was a primary focus.

300. It is asserted that each and every day that passed with the cloud of guilt hanging over his head and confirmed by every action of the Defendants in his employment context and with each day and docket occurrence in the federal civil rights matter constituted a continuing wrong which his cause of action continued to accrue on each day of the Defendants' conduct up to and including the date of the United States Supreme Court's denial of the Writ of Certiorari on February 20, 2018.

301. To date, the Defendants did nothing to comment, correct or clear the stigmatizing impact this had on Isaac Sanders.

302. The events as detailed above, continuing as separate and distinct stand-alone events by the affirmative acts of the defendants were the proximate result of the conduct of the defendant.

303. These events, detailed above, are not the ill effects or hangover from the termination of Isaac Sanders at the University but rather are new, separated and distinct events based upon the affirmative conduct of the events set forth in the preceding paragraphs.

## FIRST CAUSE OF ACTION

## 14th AMENDMENT STIGMA-PLUS CLAIM AGAINST ALL DEFENDANTS

304.  Plaintiff incorporates paragraphs 1-303 above.

305.  PASSHE and the named Defendants are a "person," as that term is used in the text of 42 U.S.C. § 1983.

306.  Following the complaint made by a student at the University against Isaac Sanders, the complaint process pursuant to University policy was carried forth up to and including the time when President Dillman found the allegations of the student to be unsubstantiated.

307.  Rather than returning Isaac Sanders to his position within the University community, Defendants Dillman and the University with the direction of PASSHE chose to terminate Dr. Sanders thereby conveying to all that he was responsible for the unsubstantiated accusations leveled against him by the student.

308.  To compound matters, PASSHE directed University counsel to conduct an "investigation" beyond that conducted by the Diversity Director and the sole purpose of this investigation was for purely public relations and the termination of Dr. Isaac Sanders.

309. The University is responsible not only for the education of post-high school students but is also responsible for the oversight of those

students who live at the University and for the first time are away from their parental homes.

310.  The outright emasculation of Dr. Isaac Sanders' personal and professional reputation was done at the behest of Defendants and PASSHE for public relations purposes and the termination of Dr. Sanders.

311.  The second investigation concluded that no wrongdoing of any nature by Dr. Sanders.

312.  Not satisfied with the fact that Isaac Sanders was again exonerated of any and all alleged misdeeds, Defendants and PASSHE retained outside counsel to conduct yet a third investigation with the sole purpose and intent of finding Dr. Sanders responsible by the rumor and innuendo that had cast a pal over the entire University community in regard to Isaac Sander's personal and professional reputation.

313.  The repeated references by the Defendants, including PASSHE and its agents, that criminal conduct was turned over to the appropriate law enforcement agencies conveyed, in no uncertain terms, that Dr. Sanders who had been terminated from his position at the University, was in fact somehow guilty of criminal conduct.   No other reasonable and logical conclusion could be deduced from the so called Sanders "investigation".

314.  All statements authored by Defendants, including PASSHE and

its agents, that implicated Dr. Sanders in any inappropriate conduct were factually inaccurate and wrong.

315.   Defendants and PASSHE's false statements conveyed by virtue of the second and third investigation into alleged conduct of Isaac Sanders that were published through the local and national media.

316.  Defendants  and  PASSHE's  false  statements  about  Isaac Sanders  were  intended  to  inflame  the  East  Stroudsburg  University community  and  any  potential  jury  pool  against  the  Plaintiff  and  to compromise the fairness of subsequent judicial proceedings.

317.  Defendants  and  PASSHE's  actions  evidenced  a  reckless  and callous disregard for, and deliberate indifference to, Plaintiff's constitutional rights.

318.  As  a  result  of  Defendants  and  PASSHE's  false  public statements,  Plaintiff  was  deprived  of  his  rights  under  the  Fourth  and Fourteenth Amendments to the United States Constitution.

319.  As a direct and foreseeable consequence of these deprivations, Plaintiff has suffered economic loss, physical harm, emotional trauma, loss of  privacy,  loss  of  employment  and  employment  opportunities,  and irreparable harm to his reputation.

320.  As a further consequence of these deprivations, Plaintiff was

required to retain counsel to represent him in the legal proceedings pursued against him, and incurred expenses associated with defending against the unfounded proceedings initiated against him.

321.  Plaintiff suffered a deprivation of his liberty interest in reputation.

322.  The statements made by Defendants and PASSHE concerning Isaac Sanders were made publicly and false.

323.  The repeated separate and distinct reputational harm outlined above constituted a continuing violation of stigma plus conduct attributable to the defendants.

324.  The factual allegations set forth in detail above with the continuing violations as factually supported and alleged constitute the continuing affirmative acts of the defendant.

325.  The acts of discrimination by the defendant as detailed above are not the ill effects of the termination of Isaac Sanders but rather separate and distinct acts of the defendant.

326.  The events as detailed above, continuing as separate and distinct stand-alone events by the affirmative acts of the defendants were the proximate result of the conduct of the defendant.

327.  These events, detailed above, are not the ill effects or hangover from the termination of Isaac Sanders at the University but rather are new,

separated and distinct events based upon the affirmative conduct of the events set forth in the preceding paragraphs.

## SECOND CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

328.  Plaintiff incorporate the allegations made in paragraphs 1-327 above.

329.  Defendants' actions in conducting a third investigation solely for public relations purposes were calculated to shame, to humiliate, and to produce public condemnation of the Plaintiff.

330.  Defendants repeatedly allowed false, insulting, offensive, and inflammatory statements about Plaintiff to shame, to humiliate, and to produce public condemnation of the Plaintiff.

331.  Defendants' conduct had the direct and foreseeable consequence of marking Plaintiff a child abuser and criminal in the minds of thousands of people.

332.  Defendants' conduct had the further consequence of making Plaintiff into a public pariah, subjecting him to extreme and sustained public obloquy, causing him to endure threats, taunts, and insults, and subjecting him to assaults by the local and national media.

333.  Despite Plaintiff's exoneration, Defendants' conduct will continue to have deleterious effects on Plaintiff, who will forever be associated with the false allegations advanced by Defendants and repeatedly publicized.

334.  As a result of Defendants' intentional and outrageous conduct, Plaintiff has suffered and continues to suffer from emotional and mental conditions generally recognized and diagnosed by trained professionals.

335.  As a direct and foreseeable consequence of those conditions, Plaintiff has suffered, and continues to suffer, emotional, mental, and physical harm.

### THIRD CAUSE OF ACTION

### DEFAMATION AGAINST ALL DEFENDATS

336.     Paragraphs 1 through 335 inclusive are incorporated herein as though more fully set forth at length.

337.  Defendants, individual and through their agents, continuously have spread false rumors that Isaac Sanders was guilty of student sexual assault and theft.

338.  Such rumors are false and defamatory.

339. Such defamatory communications harmed Dr. Sanders' reputation and lowered him in the estimation of the community.

340.  As a result of such defamatory communication, Dr. Sanders has suffered damages including but not limited to impairment of reputation in the community, personal humiliation, and mental anguish and suffering.

## FOURTH CAUSE OF ACTION

### VIOLATION OF THE CIVIL RIGHTS ACT – UNLAWFUL DISCHARGE AND CLAIM OF REINSTATEMENT AGAINST PASSHE

341.  Paragraphs 1 through 340 inclusive are incorporated herein as though more fully set forth at length.

342.  The unlawful discrimination hereinbefore stated constitutes a unlawful discharge and a violation of the Civil Rights Act.

343.  In light of the Defendants' willful, knowing and intentional discrimination against the Plaintiff, Plaintiff seeks reinstatement as set forth below.

**WHEREFORE,** Plaintiff respectfully requests entry of the following relief:

a.  entry of a declaratory judgment that the Defendants and PASSHE's policies and practices complained of herein violate the Plaintiff's rights protected under the Civil Rights Act;

b.  entry of a preliminary and permanent injunction enjoining the Defendant PASSHE, its officers, employees, agents, and all persons acting in concert with the Defendant from violating the provisions of the Civil Rights Act and directing the Defendant to restore to the Plaintiff to his former position with all wages, retirement benefits, and other employment benefits due since the termination;

c.     entry of a money judgment, awarding Plaintiff damages representing lost wages and all sums of money, including retirement benefits and other employment benefits which would have been earned but for the discrimination, together with interest on said amounts against all Defendants except PASSHE

d.     enter judgment in Plaintiff's favor and against all Defendants except PASSHE in excess of Fifty Million Dollars.

e.     grant the Plaintiff an order requiring reinstatement and to make the Plaintiff whole by an appropriate back-pay award, prejudgment interest, fringe benefits, and otherwise, for the violations described above, and if reinstatement cannot be accomplished, an award of front pay;

f.     an award to Plaintiff of cost of suit including reasonable attorney's fees; and

g.     an award to Plaintiff of such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated:   May 20, 2019          LAW OFFICE OF HARRY T. COLEMAN

By:   /s/ Harry T. Coleman
        Harry T. Coleman, Esquire
        Attorney ID.:   49137
        41 N. Main Street
        3rd Floor, Suite 316
        Carbondale, PA   18407
        570-282-7440
        Counsel for Plaintiff Isaac Sanders

# EXHIBIT A

# POCONO RECORD

## ESU President Dillman's statement

Posted Feb 26, 2009 at 12:01 AM

Students have been asking for an official response to allegations of a sex scandal and cover-up since the story was published in the Pocono Record Feb. 13.

Students have been asking for an official response to allegations of a sex scandal and cover-up since the story was published in the Pocono Record Feb. 13.

One current and five former students are suing ESU claiming former Vice President Isaac Sanders pursued unwanted sex with them and school officials covered up his alleged crimes.

A communication with students about the scandal was finally made in the form of a letter, Tuesday:

To: The Students of East Stroudsburg University

From: Dr. Robert J. Dillman, President


Subject: Addressing Your Concerns

Many of you have expressed your concerns over the allegations made against a former university vice president that are included in a lawsuit filed recently by six current and former ESU students. Let me make it clear, incidents such as those that have been alleged must never be tolerated on this or any college campus.

I understand your concerns and your need for answers in regard to these accusations. Please know that, as much as I and others have wished to address your concerns and answer the questions you have, it has not been possible to do so because of the current litigation. It is essential that proper legal procedures be carefully followed so that the university will have the full range of options available for action once the investigation is concluded.

As president of ESU I want you all to know that your safety, your security and the integrity and excellence of your education are essential. While I cannot provide any more specific information right now, I promise to do so at the appropriate time. If you have any other issues of concern, please feel free to contact me through the office of university relations: e-mail address: university.relations@po-box.esu.edu or call 422-3532.

Thank you.

# EXHIBIT B

# POCONO RECORD

## ESU's students deserve better

Posted May 31, 2009 at 12:01 AM

East Stroudsburg University lives up to its mission of educating students. But its leadership has failed badly in another key component of its mission: upholding its values. An ill-advised public silence persists involving departed former chief fundraiser Isaac Sanders, accused in civil lawsuits of sexually harassing and abusing six students, along with an alleged coverup by top administrators.

East Stroudsburg University lives up to its mission of educating students. But its leadership has failed badly in another key component of its mission: upholding its values. An ill-advised public silence persists involving departed former chief fundraiser Isaac Sanders, accused in civil lawsuits of sexually harassing and abusing six students, along with an alleged coverup by top administrators.

Recently the Pocono Record obtained in-house correspondence indicating that ESU President Robert Dillman acknowledged that evidence confirmed Sanders' wrongdoing as early as last fall. Sanders headed the ESU Foundation and spearheaded fundraising for the $41 million new Science and Technology Center. Sanders left ESU last October, but Dillman never publicly confirmed he was fired.

In an April memo to top aides and university trustees, however, Dillman wrote that "Dr. Sanders was immediately removed from his role on campus upon the receipt of corroborating information concerning the claims against him of inappropriate conduct." Verification of that inappropriate conduct, Dillman added, "ultimately led to the severing of his relationship with the university."

ESU's mission statement includes an explicit "Values Statement" committing the

university to "principles of intellectual integrity, freedom of expression, the fair and equal treatment of all, good citizenship, environmental stewardship, and accountability for our actions and the resources entrusted to us." (Emphasis added)

Surely students — their education and their personal welfare — are ESU's biggest responsibilities.

Yet over many months and through today, Dillman and other leaders failed to be candid with those who were most directly affected by Sanders' alleged actions: the student victims, and other students who came under Sanders' sphere.

And despite this "corroborating information" the university is attempting to have the students' suit dismissed on the basis of a statute of limitations. The state Attorney General's Office is representing Dillman, ESU, Provost Kenneth Borland and Associate Vice President Victoria Sanders (no relation to Isaac Sanders) in the dismissal filing.

Asked about the deployment of a technical defense, a spokesman from the Governor's Office only repeated several times that the Commonwealth is not representing Isaac Sanders, but other "named defendants."

Yes, sad to say, Monroe County's state-run institution of higher learning and its top officials are most interested in protecting themselves, and in that effort they are aided and abetted by Pennsylvania's highest law enforcement official in an attempt to dump an abuse case based on a legal technicality.

ESU has enjoyed a fine reputation for many decades of educating students and preparing young people to be tomorrow's leaders. The Isaac Sanders episode and continuing coverup are

poor lessons for today's students.

# EXHIBIT C

# POCONO RECORD

Opinion

# Echoes of PSU at ESU

Posted Nov 20, 2011 at 12:01 AM

The Penn State child molestation case resonates uncomfortably here in the Poconos.

The Penn State child molestation case resonates uncomfortably here in the Poconos.

Sandusky, for 32 years assistant to Penn State University's revered football coach Joe Paterno, is accused of being a serial molester of at-risk boys. In recent days as revelations have exploded, PSU trustees fired university President Graham Spanier and their beloved Paterno.

The allegations against Sandusky parallel charges former students and staff members raised against one-time East Stroudsburg University top fundraiser Isaac W. Sanders. The difference? The alleged victims' ages. Sandusky allegedly used his charity, The Second Mile, to create an undending stream of potential child victims. Sanders' accusers say he made friends with and mentored college-age minority youths or young men, gave them scholarships and tuition assistance or other gifts, often unasked for, then sexually assaulted them.

The parallels include what higher-ups did — or failed to do — when they heard the accusations.

Spanier and Paterno lost their jobs because trustees believed they had not done enough to stop Sandusky given allegations that went back many years.

In 2007, ESU trustees, within weeks after the first sexual harassment charges were raised, gave Sanders a $10,000 bonus for successful fundraising, including $9 million for the new Science and Technology building. In 2008, they paid out a $140,000 settlement to a Sanders accuser and former colleague who resigned after signing a nondisclosure agreement. That September they gave ESU President

Robert Dillman a vote of confidence and extended his contract. In October 2008, ESU fired Sanders; in November, 2008 Monroe County District Attorney E. David Christine said he was investigating the man.

By early 2009, a total of six plaintiffs filed a lawsuit depicting Sanders as a sexual predator who tried to trade scholarships and campus jobs for physical intimacy between 2003 and 2008. The suit also named as defendants Dillman, two other top administrators and the trustees.

Sandusky now faces 40 criminal charges related to the allegations about his assaults of young boys.

There's never been a criminal charge against Sanders. The DA has not said another word about the criminal investigation.

Both these cases are all about protecting the institution and the money. Paterno's winning record and reputation as a moral guidepost for his players built Penn State's football program into a multi-million-dollar enterprise. At ESU, accusers believe Sanders' prowess as a fundraiser prompted top ESU brass, including Dillman, to turn a blind eye to the sexual assault charges.

It is outrageous that so many people failed to intervene with Sandusky or report their suspicions or observations to police. Children's lives were at stake.

It's equally outrageous that ESU officials were so dismissive of early reports about Sanders and that they have played coverup ever since.

If an ESU official indeed used his position of power over young men to sexually assault them, when do they get justice?

# EXHIBIT D

# POCONO RECORD

# High praise preceded ESU exec's dismissal

**By CHRISTINA TATU**

Posted Jun 24, 2013 at 12:01 AM
Updated Jul 30, 2013 at 5:41 PM

Isaac Sanders, once East Stroudsburg University's chief fundraiser, received a glowing employee review plus a raise within a month of being placed on leave over allegations that he sexually harassed several male students.

Isaac Sanders, once East Stroudsburg University's chief fundraiser, received a glowing employee review plus a raise within a month of being placed on leave over allegations that he sexually harassed several male students.

Recently filed court documents in a pending federal court case against Sanders cast new light on developments leading up to and following his placement on administrative leave over the allegations.

One week after placing Sanders on leave with pay on July 1, 2008, ESU's then-President Robert Dillman completed a six-page, satisfactory review of Sanders' job performance, according to court files.

The review covers Sanders' employment at the university from July 1, 2007, to June 30, 2008, and was signed and dated by Dillman on July 8, 2008.

In August 2007, the first young man involved in the case against Sanders filed sexual harassment charges, which were investigated by, and later dismissed, by university officials.

Sanders, who was director of the East Stroudsburg University Foundation and vice president for advancement at the time, was placed on administrative leave after the Pocono Record reported several other students were making similar allegations against him.

On Aug. 8, 2008, Dillman sent a letter to Sanders' home notifying him he was eligible for a raise and would receive a $6,800 increase to his $136,006 annual base salary.

The raise was retroactive to July 1, 2008, the day Sanders was placed on administrative leave.

Sanders was eventually fired on Oct. 22, 2008, after the completion of an outside investigation.

Dillman, who did not immediately return a phone call Friday for comment, did address the review and pay increase in a Dec. 21, 2011, deposition recently made public in court filings.

He asserted it was up to PASSHE to determine which managers received raises, but PASSHE officials last week said otherwise.

"I didn't give him a merit increase," Dillman said in his deposition.

"The PASSHE system gave him merit increases, correct, or the (PASSHE Board of Governors)?" asked Albert Murray, the attorney representing the plaintiffs in the case.

"He got pay raises like everybody else, but I never gave him a merit raise, per se," Dillman said.

Every few years, when the money is available, the PASSHE Board of Governor's adopts a policy setting aside a percentage of each university's budget to be used for merit raises, PASSHE Vice Chancellor for External Relations Karen Ball said on Tuesday.

This policy ensures that nonunion employees receive raises, she said. But it is officials from the individual universities who are responsible for completing performance evaluations and determining which employees are eligible for a raise.

"The employees all must receive completed performance evaluations, and based on their rating in that evaluation, it tends to drive the scale of the percentage (raise) the employee gets," Ball said. "It goes back to the university to decide who gets a raise."

In addition to the $6,800 raise Sanders received to his base salary in July 2008, he was also awarded a $10,000 bonus from the board of directors of the foundation in February 2007.

The "State System of Higher Education Management Performance Appraisal and Development Form" is an employee evaluation undertaken every fiscal year, according to court documents.

Each year, the employee being reviewed and their supervisor sit down to set out various goals related to the employee's job, Dillman said, according to court files. Dillman was Sanders' direct superior and therefore the supervisor who would conduct the review and help Sanders choose his goals.

Sanders is scored in each category on a scale of 1-3, or "below expectations," "at or above expectations" and "significantly exceeds expectations."

Dillman's remarks in the review show just how important Sanders was to ESU's fundraising endeavors.

Sanders was successful in securing the "largest scholarship gift in history from an ESU alumni, Betty Baltz," for more than $1 million, Dillman said in the review.

Sanders also "secured the largest gift annuity in ESU history of $100,000," and surpassed that year's Comprehensive Campaign goal of $3 million by $155,831.

Sanders repeatedly scored high marks throughout the review, which doesn't make any mention of the original sexual harassment charge filed against him in August 2007, or the administrative leave he was placed on just one week before the review was signed and dated by Dillman.

"The evaluation was for the prior period. It was the beginning of an investigation and that investigation certainly wouldn't have been done in a week," Ball said.

Sanders is scored in areas including, "Health of the University," "Job Specific Performance Areas," and "Teamwork and Collaboration."

"The success of the advancement office in achieving and exceeding its financial goals has been due to the leadership of Isaac Sanders," Dillman wrote. "Isaac has worked to improve diversity in his office and around the campus. He has been a very important team player in the senior staff "» . One caveat is the need for

Case 3:18-cv-01423-ARC Document 35 Filed 05/20/19 Page 81 of 108

stable staffing and new hires that bring expertise to the organization."

Dillman gave Sanders an overall performance rating of 2.8 out of 3.

# EXHIBIT E

# POCONO RECORD

Opinion

## Help Record search in Sanders case

Posted Jun 30, 2013 at 12:01 AM

The last thing East Stroudsburg University needed back in 2007 was a claim that its chief fundraiser had sexually harassed a male student. ESU was in the midst of a major fund drive to pay for its new Science and Technology Center. Yet more than one such unsavory charge surfaced against then-Vice President for Advancement and Executive Director of the East Stroudsburg Foundation Isaac Sanders. Over time these and allegations he had mishandled funds tarnished his reputation and eventually, it seems, cost him his job.

The last thing East Stroudsburg University needed back in 2007 was a claim that its chief fundraiser had sexually harassed a male student. ESU was in the midst of a major fund drive to pay for its new Science and Technology Center. Yet more than one such unsavory charge surfaced against then-Vice President for Advancement and Executive Director of the East Stroudsburg Foundation Isaac Sanders. Over time these and allegations he had mishandled funds tarnished his reputation and eventually, it seems, cost him his job.

But the process took a long time. It involved anonymous letters, lawsuits, colleague complaints, investigations and, irony of ironies, both a bonus and a glowing employee review for Sanders shortly before he left ESU.

If it all sounds curious to you, that's good. It sure did to the Pocono Record. Lawsuits generally cause people to clam up, and ESU officials were no exception. So in 2009 this newspaper filed formal requests under the Freedom of Information Act for documents that would help shed light on the complicated story. By this time it included claims that Sanders had tried to trade sexual favors

from young men for ESU scholarships and other gifts. More questions surfaced about whether he might have diverted donations that were given to scholarships or the building fund to his own, personal purposes, and whether ESU's popular president at the time, Robert Dillman, knew but said nothing.

Sanders was fired from his job in October 2008 after an investigation by an outside law firm. But it's only now, almost five years later and thanks to a favorable ruling from the state Supreme Court, that the Pocono Record has obtained the documents it sought. All 13,889 pages of them.

That's where your curiosity comes in. Our small staff needs help to comb through the mountain of paper that chronicles a part of the story: letters, forms, research and other papers relevant to six donors and others. What we're trying to find is evidence of scholarship money ending up in other ESU Foundation accounts, endowments diverted to other purposes, building campaign pledges versus what actually got recorded as gifts.

So, the saga of sex and money continues. Interested? Read Dan Berrett's story on today's A1 and follow the link to the document cache on our website. If you find anything of note, email us at poconorecordhelper@gmail.com citing the document batch and page numbers.

Your tax dollars pay much of the salaries and other operational costs at ESU. You deserve to know how its officials conducted their business, including how those at the very top managed free will gifts designed to further the prospects of its students.

# EXHIBIT F

# POCONO RECORD

## Ex-ESU president sat on accusatory letters

**By CHRISTINA TATU**

Posted Jul 1, 2013 at 12:01 AM
Updated Jul 30, 2013 at 5:43 PM

Three anonymous letters surfaced alleging multiple cases of sexual harassment against students at the hands of a top university fundraiser, but East Stroudsburg University's then-president, Robert Dillman, never gave the letters to ESU's internal investigator.

Three anonymous letters surfaced alleging multiple cases of sexual harassment against students at the hands of a top university fundraiser, but East Stroudsburg University's then-president, Robert Dillman, never gave the letters to ESU's internal investigator.

That revelation is contained in Dillman's 275-page deposition transcript, recently filed as an exhibit in a federal lawsuit that's slated to come to trial in the fall.

Dillman details sharing the letters with a university attorney, his wife, Roseann, and at least one of the letters with Isaac Sanders, then the vice president of advancement and executive director of the nonprofit ESU Foundation.

The letters accused Sanders of unwanted sexual contact with students.

The letters were received in the fall of 2007, after the first complaint of sexual harassment was filed with the university by a male student against Sanders.

Dillman did not have any contact with Arthur Breese, who was conducting the internal investigation into that student's claims, between August 2007 and Dec. 10, 2007 — the time in which Breese was conducting his investigation.

When several more students came forward in June 2008, making similar accusations, the university called in an outside law firm to investigate.

In his deposition, Dillman said he did not believe the letters contained information that would have benefited Breese's investigation.

The letters also seemed to imply Sanders was involved in consensual gay sexual relationships, Dillman said, and in his opinion, the letters seemed hateful toward gays and minorities.

"So, in your mind, it was that since this person who was sending you this letter alleged, based upon a conversation or knowledge of Sanders, that (the victims) were 18-year-old adults having consensual gay relationships, that it was no big deal," asked Albert Murray, attorney for the plaintiffs, during Dillman's deposition.

"I have no way of knowing whether that — because having a gay relationship is not against our policy at the university," Dillman said.

"The second part is there was no indication of any information. This was, from my perspective, gay bashing, quite frankly, and therefore, it led me to believe that this individual was very angry at gays, and also, with the last paragraph (of the second letter), angry at African-Americans."

Murray asked if that was the reason Dillman did not give the letter to Breese.

"Yes. Because, really, this dealt with consensual relationships — gay bashing, in my view — with no complaint, no names, no indications of the substance"»," Dillman said.

Dillman did not respond to a phone call seeking comment Thursday.

The first letter, addressed to Dillman and sent September 2007, focused on Vincent Dent, then-director of major gifts at ESU.

Dent was hired by and worked directly with Sanders, and worked at the university from March 2005 until January 2008.

The letter included a link to the website of Michigan's Attorney Discipline Board, outlining Dent's troubled legal background, which included having his law license suspended three times for a total of five years in the late 1980s and early 1990s for failing to refund unearned fees and for misappropriating a client's settlement money.

A second anonymous letter, addressed to Dillman in October 2007, alleged sexual liaisons between Sanders and students.

A third letter, which arrived in November 2007, refers to the student who was having his case investigated internally by then-ESU director of campus diversity and mediation, Breese.

"As you now no doubt know, this young man was one of many. You can easily find the others (another group on campus has identified four students so far)," that letter said.

That letter was addressed to Dillman, the ESU Council of Trustees and Bill Cramer, who had once served as chairman of the ESU Foundation.

Dillman said he didn't recall holding an executive session with the Council of Trustees to discuss the letters.

"I don't remember doing that. I just don't recall that at all, but I — it's very vague, so I don't really have a memory of having an executive session on that issue," Dillman said in his deposition.

Just who did Dillman show the letters to?

Dillman did not show the letters to Breese, but handed them over to Pennsylvania State System of Higher Education attorney Andy Lehman, who represented the university.

Dillman also shared the letters with Victoria Sanders (no relation to Isaac Sanders), who was the university's associate vice president for diversity and equity, and who would have helped in sending the letters off to Lehman, according to Dillman's deposition.

As for his rationale behind sharing one of the letters with Sanders, "I felt he should at least see some of the anonymous threats — not threats, but anonymous comments being made about himself," Dillman said.

Dillman discussed with the university's legal team whether to show Sanders the letter before discussing it with Sanders during one of the weekly meetings the two men had in Sanders' office.

During the weekly meetings, Dillman said he and Sanders would discuss fundraising activities. The deposition did not detail the conversation Dillman and Sanders had about the letter.

Dillman also shared the letters with his wife.

"I think I showed her all the letters because I — I respect her opinion," he said in his deposition. "I was asking her to look at the letters from her perspective as a woman."

"And you chose not to have Arthur Breese look at this letter. You've testified to that, correct?" Murray asked, referring to the second anonymous letter.

"Absolutely"»" Dillman said.

Breese, in previous interviews with the Pocono Record, has said his efforts to investigate that first male student's claims were closely managed — and effectively stymied — from above.

ESU administration took atypical steps to maintain the confidentiality of the claims against Sanders, Breese has said.

That meant excluding Breese's administrative staff from the investigative process and barring Breese from interviewing others on campus because it would have spread knowledge about the complaint.

PASSHE sometimes even dictated which questions Breese should ask during the investigation, he said in a previous interview.

Dillman said he purposefully distanced himself from the internal investigation being conducted by Breese because he had to act as the final arbiter, meaning Dillman was to review Breese's finished report and decide whether there was any merit to the sexual harassment claims the first student filed against Sanders.

"Wasn't it important to you to know what was going on with regard to Isaac Sanders?" Murray asked.

"Sure," Dillman said.

"But you chose not to contact"»," Murray says.

"Because I was the final arbiter," Dillman said.

"Correct, you were the final arbiter. Under what rule or procedure do you — are you the final arbiter?"

"The (university's) harassment and discrimination policy. The way in which that office runs, if it goes from — if the complaint is against a vice president then it's my responsibility," Dillman said.

"If it's anything beyond that or below that then it goes to the appropriate vice president and, so in that case, I wanted to stay as far away from anything dealing with the case until the report came in when it was finalized," Dillman said.

"I knew nothing about the details of the investigation until I received it on Dec. 10, 2007. I never talked to Arthur Breese, I never talked to Vicky Sanders about it. Consequently, this, in my opinion, was completely not a sexual harassment, but it was a consensual relationship if you look at it as a gay relationship with no ideals beyond that from a claimant with any of that. That's basically what I saw it as."

EXHIBIT G

# POCONO RECORD

# Email lists ESU employee complaints on Sanders

**By CHRISTINA TATU**

Posted Jul 8, 2013 at 12:01 AM
Updated Jul 30, 2013 at 5:42 PM

Complaints about East Stroudsburg University's former top fundraiser, Isaac Sanders, go back as far as 2004, according to an email alleging Sanders intimidated his employees and favored minority job applicants.

Complaints about East Stroudsburg University's former top fundraiser, Isaac Sanders, go back as far as 2004, according to an email alleging Sanders intimidated his employees and favored minority job applicants.

The email, from Susan McGarry, ESU's vice president for human resources at the time, was sent to then-ESU President Robert Dillman; Julie Del Giorno, who was Dillman's executive assistant; and Victoria Sanders (no relation to Isaac Sanders), who was the university's associate vice president for diversity and equity.

The Oct. 29, 2004, email is one of many documents recently filed as exhibits in a federal lawsuit slated to come to trial in the fall.

"As per our conversation, following are some issues that have been brought to my attention on more than one occasion from SEVERAL of Isaac's staff regarding his approach to the search process," the email begins.

"I am extremely concerned about how he appears to be intimidating people to make recommendations that might not be in the University's best interest."

In a list, numbered one through nine, McGarry goes on to outline the concerns various employees had about Sanders.

The email does not specify which job search was being undertaken at the time. However, Sanders hired Vincent Dent as director of major gifts at ESU in March 2005.

Dent left the university in January 2008, after which it was revealed that during his ESU tenure he charged an array of personal expenses to his university-issued credit card, which was paid for with public funds.

The charges included a four-piece set of luggage, $280 for a suit and alterations, as well as a silk tie, dry cleaning, eyeglasses, golf clubs, golf shirts, car washes, shoes, a monthly E-Z pass fee, the registration fee for the access card to his gated community and repeated car rentals for regional travel, including $1,500 as part of a larger charge for a six-month rental.

The total for those charges topped $4,000.

In a previous interview with the Pocono Record, Dent had said he repaid all of the expenses.

McGarry also did not immediately return a phone call or email for comment.

She stopped working at the university in 2006.

Dillman did not immediately return a phone call for comment. Dillman does address the email in a recently released 275-page transcript of his deposition.

"As a result of this memo, did you or anybody from human resources interview anyone in the office, the Advancement Office, concerning these complaints about discrimination?" asked Albert Murray, attorney for the plaintiffs, during Dillman's Dec. 21, 2011, deposition.

"Not to my knowledge," Dillman said.

"Did you look into this issue and start an investigation?" Murray asked.

"Well, I talked to Isaac Sanders about it, yes," Dillman responded.

"Well, he denied that he was trying to do anything that would cast any aspersions at one group versus another. I told him that he was — in my view he needed to follow the procedures and that he was supposed to be open to get the best candidate, I remember saying."

"I never really heard much more about it after my conversation with him," Dillman said.

"I trusted Susan's memo from the standpoint I don't think she would have just been putting this together, but I also believe that I did talk to him about it, as I recall, and that he understood what I was asking him to do," Dillman said.

Dillman did not remember which three employees were terminated from Sanders' division.

"I wouldn't have known that anyway," Dillman said when asked about the terminated employees.

As for the hiring process in the advancement office where Sanders worked, there was a certain protocol to follow, Dillman said in his deposition.

That involved setting up a hiring committee, which would have included a chairperson, and people who represent "different elements that these individuals would be working with," Dillman said.

Often, there would be a member of human resources on the search committee, he said.

Although a committee had been set up, it was up to Sanders to make the final decision of whom to hire, Dillman said in the deposition.

# EXHIBIT H

# POCONO RECORD

## ESU Foundation: Where did the $250G contribution go?

By DAN BERRETT
Posted Jul 29, 2013 at 12:01 AM
Updated Jul 30, 2013 at 5:30 PM

In 2003, a local philanthropist gave $250,000 to East Stroudsburg University to help the university realize a dream: the Science and Technology Center, which eventually opened five years later.

In 2003, a local philanthropist gave $250,000 to East Stroudsburg University to help the university realize a dream: the Science and Technology Center, which eventually opened five years later.

Isaac Sanders, who was then the vice president of university advancement and executive director of the ESU Foundation, sent a letter to the donor acknowledging the gift's purpose.

But a gift receipt shows that the money went to another account: the foundation's general operating fund.

That raises questions about how the former fundraising chief managed donations and whether shortcuts were taken to get the science center financed.

Sanders is accused in a federal lawsuit of using money and gifts to pave the way for unwelcome sexual advances toward students. The suit, originally filed by six current and former students, further alleges that other top administrators turned a blind eye to Sanders' behavior.

The allocation of the six-figure gift, which the foundation says was in keeping with the donor's desires, was revealed in a trove of documents that the foundation released to the Pocono Record after a four-year, precedent-setting court battle over public records.

The Pocono Record last month posted 13,889 heavily redacted records that it received, and sought readers' help in wading through the documents.

Specifically, we're looking to see whether money donated for one purpose ended up earmarked for another.

How does this matter? Isn't this just about obscure accounting practices?

A misdirection of funds could have violated the donor's stated desire for where the money should be earmarked.

Further, an artificially propped-up fund would give the illusion of a healthier bottom line, which would please bond underwriters financing the building's construction, according to one expert.

For its part, ESUF maintains the money went to its intended purpose.

Redirecting capital campaign money toward general operating support can be an acceptable practice as long as the donor agrees, said Lisa A. Myers, a certified public accountant in Camp Hill who has audited nonprofits and governmental agencies, and has conducted forensic investigations of financial fraud.

If the fundraising proposal for a building campaign contains language that allows the organization receiving the gift to allocate part of a gift to pay for its operations or to meet needs associated with the project, that's OK, she said.

It is unclear whether the ESU Foundation proposals contained such a proviso.

A subsequent proposal to the same donor seeking more money for the building makes no mention of using any money for the foundation's operating costs, according to public records.

The foundation's president, Frank Falso, who took over for Sanders in 2010, wrote in an email: "The referenced donation was received, deposited and applied to the Science and Technology fund in accordance with the donor's direction."

He declined to specify whether this meant the records were in error, or if the donor wanted his gift to go into the general operating fund.

Neither the donor's lawyer, Marc Wolfe, nor Sanders' lawyer, Harry Coleman,

responded to requests for comment.

An application of restricted funds contributed to Sanders' firing.

That gift, a $56,598 bequest from the estate of Doris Imbt, was misallocated, according to the termination letter that Robert Dillman, who was then ESU's president, sent to Sanders.

The gift was supposed to be restricted, and used only for the class of 1938 scholarship fund.

It, too, wound up in the ESU Foundation's general operating fund instead.

The foundation also could have conceivably asked the donor to remove any restrictions on the money if it needed to do so.

Such a request could have been done verbally, said Myers, though it also would have been a good idea to document the agreement.

A letter to the donor from Sanders in 2005, which was meant to independently verify the purpose of the gift, also confirmed that the money was meant to be restricted for the Science and Technology Center.

A third way to tell if the money was properly allocated would be to consult an accountant's records stating a professional opinion on the financial controls of the organization.

Such an opinion appears in the management letter accompanying an organization's audit.

In 2009, accountants for the ESU Foundation, Concannon, Miller & Co., warned of "material weaknesses" in the foundation's financial controls.

Such a weakness is generally considered the most serious deficiency that an accountant can identify.

It means that there is a "reasonable possibility" — or it is "probable" — that a false statement in an organization's finances will not be detected, according to the standards of American Institute of Certified Public Accountants.

It is not clear how classifying the donation one way and applying it elsewhere, as

the records may indicate, would have benefited the foundation or ESU.

One possibility, said Myers, is that a healthy balance in the general operating fund would please the bond underwriters who were evaluating the Science and Technology Center project.

The price tag on the project had increased in price around the time that donation was made, and the foundation had just taken responsibility for paying the bulk of debt service on the deal.

The names of donors are redacted in the documents, as ordered by the Commonwealth Court, which ruled in the Pocono Record's favor in its open records case.

Still, the documents in which the possible discrepancy appears provide some strong clues as to who the donor was: Lester Abeloff, who died July 16.

A research report outlining the donor's potential giving capacity describes him as a 1939 graduate of ESU, which Abeloff was.

It also identifies him as a donor to Temple Israel, Pocono Medical Center, the YMCA, and the Salvation Army, many of which, he told the Pocono Record in 2008, were his top charities.

The profile of the donor also notes that the center for the performing arts is named in his honor. ESU's performing arts center is named after Abeloff.

The donor file includes the program for ESU's winter commencement in December 2004.

The name of the sole recipient of an honorary doctor of humane letters is redacted. Abeloff received that degree during that ceremony.

Further, a 2010 letter from Falso refers to "Lester's $500,000 pledge."

# EXHIBIT I

# POCONO RECORD

Opinion

## Sanders case may have ripple effects

Posted Sep 25, 2013 at 12:01 AM

Don't mess with people's money.

Don't mess with people's money.

That message forms the core of a complicated case involving East Stroudsburg University's former chief fundraiser, Isaac Sanders, who was fired in 2008 over a scandal involving money and sex.

Sanders came to public attention only in 2007, when several former students claimed in a lawsuit that he had propositioned them for sex, offering them cash and gifts for their favors.

Yet complaints about Sanders' job performance had swirled behind the scenes but beyond the university long before the sex scandal broke. One document recently uncovered in court filings show that local philanthropist Bill Cramer complained in 2003 that Sanders had mishandled an endowed scholarship that Cramer had set up in honor of his mother through the ESU Foundation. Cramer said part of the principal of the endowment was used improperly to cover administrative costs. Cramer replenished the gap in 2001, but had trouble from 2005 until after Sanders was fired in obtaining regular reports on the fund's status.

Sanders' former assistant, Carolyn Bolt, complained to then-ESU President Robert Dillman in 2007 about Sanders' management of the money in a private, charitable foundation that Sanders led. Bolt also complained the way Sanders and another assistant, Charles Dent, handled ESU Foundation funds, and complained about a hostile work environment. Bolt went on leave, then eventually left her position after receiving a $140,000 settlement.

Dillman outlined in an October 2008 letter to Sanders reasons why he was being fired. Dillman cited Sanders' mishandling of a scholarship fund that ESU alumna

Doris Imbt helped create in 1988. Sanders diverted a $56,698 check sent from Imbt's estate in 2007 to the ESU Foundation's general fund. Dillman also chastised Sanders in the termination letter for having used foundation funds to pay off a student's outstanding bill. The student whose bill Sanders paid was one of several of the plaintiffs who accused Sanders of extracting sexual favors.

Money matters. It matters especially when people are donating it to an institution and expecting it to be safeguarded and used properly for the designated purpose. Substantive complaints reached Sanders, the university board and even the president for several years before the sex scandal — itself still unresolved — brought Sanders' conduct into the public eye, and another year passed before Sanders finally got the boot.

This newspaper continues exploring the myriad public documents it received and will continue reporting on the Sanders saga. In a recent interview, Cramer, a prominent lawyer and civic activist, asked a question that explains why that research is still important even though Sanders is gone.

"If they were treating me this way," Cramer said, "what were they doing to other people?"

# EXHIBIT J

# POCONO RECORD

## ESU cleared of Sanders sex suit

**By CHRISTINA TATU**

Posted Apr 16, 2014 at 12:01 AM
Updated Apr 16, 2014 at 4:00 PM

A federal judge has dismissed claims that East Stroudsburg University and former top officials there acted with "deliberate indifference" toward and conspired to cover up sexual harassment claims made against former top fundraiser Isaac Sanders.

A federal judge has dismissed claims that East Stroudsburg University and former top officials there acted with "deliberate indifference" toward and conspired to cover up sexual harassment claims made against former top fundraiser Isaac Sanders.

Judge Robert Mariani dismissed those allegations against ESU, including former President Robert Dillman; Kenneth Borland, the former provost and vice president for academic affairs, and Victoria Sanders, the former associate vice president for special projects and assistant to the president (no relation to Isaac Sanders).

Prior to Monday's ruling, counsel for the plaintiffs and defendants stipulated to the dismissal without prejudice of the members of the ESU Council of Trustees.

The judge did, however, find enough evidence to move forward with allegations that Isaac Sanders made inappropriate sexual advances toward students and acted inappropriately in his role as a top university administrator.

The 2009 lawsuit alleges Sanders, the former vice president of advancement and director of the ESU Foundation, provided gifts, scholarships and jobs in exchange for unwanted attempts at sexual intimacy with male students.

The judge's ruling, filed Monday evening, says the allegations specifically against

Sanders will move to trial, but no trial date was set.

"We are pleased with the ruling, which basically dismissed the claims against the university and former President (Dillman)," said Pennsylvania State System of Higher Education spokesman Kenn Marshall. "My understanding is the only thing that's left are the charges against Isaac Sanders himself."

Dillman did not immediately return a phone call for comment Tuesday evening.

Albert Murray, an attorney for the plaintiffs, said he is exploring the possibility of an appeal.

"What can I say? That's how the judge ruled," Murray said.

The lawsuit has two major components.

First, it addressed the sexual harassment claims of six current and former students (three of which were dismissed due to the statute of limitations).

Those claims will be heard in court.

The second part alleged the university violated the rules of Title IX, or more specifically, it challenged whether ESU officials acted appropriately in dealing with the complaints against Sanders.

The lawsuit alleged ESU officials had knowledge of Sanders' alleged sexual improprieties prior to the first official complaint filed against him by one of the plaintiffs in 2007, but did nothing to stop it.

The suit also alleges ESU officials acted to cover up the allegations against Sanders and impeded an internal investigation conducted by Arthur Breese, then the director of diversity and campus mediation at ESU.

In order to proceed under Title IX, the plaintiffs must establish a case demonstrating they were subject to a sexually hostile environment.

They must demonstrate an appropriate authority was notified of the harassment, but the institution's response to the misconduct or harassment amounted to "deliberate indifference," court documents say.

Mariani said university officials did react appropriately, however.

They followed the "Notice of Non-discrimination handbook," detailing the necessary steps to be undertaken by the Office of Diversity and Equal Opportunity when conducting an investigation, he ruled.

Mariani was also critical of the incidents and witness statements plaintiffs submitted as evidence that university officials had prior knowledge of Sanders' alleged misconduct. The evidence submitted was based on hearsay and not solid witness accounts, he said.

The university defendants, when they were provided with actual notice of the plaintiffs' complaints, had a "virtually immediate response," resulting in Sander's suspension from the university in July 2008 and termination in October 2008, according to the judge's ruling.

The judge ruled the plaintiffs' allegations of repeated "groping, touching and feeling" without consent, as well as repeatedly forcing "unwelcomed acts of oral sex and other acts of a sexual nature," are enough to move to trial.

Mariani dismissed allegations Sanders conspired with other university officials to violate the rights of the plaintiffs and cover up the alleged sexual assaults.

"I just got off the phone with Dr. Sanders. He's waited a long time for his day in court," said Sanders' attorney, Harry Coleman. "And to the extent that he's finally going to be able to vindicate his name and take on these allegations one-by-one, he's ready. He's ready for his day in court."

One of the questions is whether Sanders violated the plaintiffs' constitutional rights.

Sanders had previously argued complaints against him should be dropped because they amounted to "purely private conduct" outside his scope as a public employee.

He also argued one of the plaintiff's allegations center upon off-campus conduct that occurred at a time when the plaintiff was no longer working with Sanders. Sanders first met all of the plaintiffs in his role as a university official, however, Mariani wrote.

He called Sanders' claim "frivolous."

"As Vice President for Advancement at ESU, a public university, I. Sanders was

clearly a state employee "» all three men came in contact with I. Sanders on campus, and solely by virtue of their status as students at ESU and I. Sanders' position of authority at the University," the judge wrote.

Sanders' request also "purposely misrepresents or ignores the entirety" of one of the plaintiff's allegations, the judge said.

"Therefore, there is sufficient material issues of fact for trial, in particular with respect to whether I. Sanders engaged in sexual harassment, sexual assault and/or other sexual misconduct against (the plaintiff) in 2004, 2005 and 2007, both on and off the ESU campus," court documents say.

"By virtue of his position, I. Sanders was able to misuse his authority in the course of performing his duties. His actions do not constitute 'purely private conduct.'"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ISAAC W. SANDERS,**<br><br>          **Plaintiff,**<br><br>    **v.**<br><br>**PENNSYLVANIA'S STATE SYSTEM<br>OF HIGHER EDUCATION,**<br><br>          **Defendant.** | **CIVIL COMPLAINT**<br><br>**NO. 3:18-CV-1423-RDM**<br><br>**JURY TRIAL DEMANDED** |

## <u>CERTIFICATE OF SERVICE</u>

I, Harry T. Coleman, Esquire, counsel for Plaintiff, Isaac W. Sanders,

hereby certify that on this date, I caused to be served a true and correct copy

of the foregoing Second Amended Complaint via ECF upon the following:

> Jessica S. Davis, Senior Deputy Attorney General
> Alison Diebert, Deputy Attorney General
> Office of Attorney General
> 15th Floor, Strawberry Square
> Harrisburg, PA 17120
> *Counsel for Pennsylvania's State System of Higher Education*

LAW OFFICE OF HARRY T. COLEMAN

Dated:  <u>May 20, 2019</u>

By:  <u>*/s/ Harry T. Coleman*</u>
      Harry T. Coleman, Esquire
      Attorney ID.:  49137
      41 N. Main Street
      3rd Floor, Suite 316
      Carbondale, PA  18407
      570-282-7440
      *Counsel for Plaintiff Isaac Sanders*